Douglas Arnold GIBSON, et al.,

v.

COUNTY OF RIVERSIDE, et al.

No. ED CV 94–441–RT.

United States District Court,
C.D. California,
Eastern Division.

Jan. 4, 2002.

Christopher Brancart, Brancart & Brancart, Pescadero, CA, James D. Smith, Law Offices of James D. Smith, Berkeley, CA, for plaintiffs.

Bruce Disenhouse, Kinkle, Rodiger & Spriggs, Riverside, CA, Timothy T. Coates, Greines, Martin, Stein & Richland, LLP, Beverly Hills, CA, for defendants.

PROCEEDINGS: ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND SUMMARY ADJUDICATION OF ISSUES AND (2) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT.

TIMLIN, District Judge.

The Court has read and considered plaintiffs' and defendants' motions for partial summary judgment, defendants' and plaintiffs' oppositions, and plaintiffs' and defendants' replies, as well as the admissible evidence and all supplemental briefing. Based on such consideration, the Court concludes as follows:

## I.

## BACKGROUND

Since 1978, the County of Riverside ("the County") has enacted ordinances imposing age restrictions on persons occupying dwelling units in certain areas within the unincorporated areas of Riverside County and has enforced those ordinances. Within these areas, the County forbids the residency of persons who do not meet certain age qualifications. While acknowledging the permissibility of age restrictions on certain activity when imposed and enforced by private parties in accordance with state and federal law, plaintiffs challenge the constitutionality and legality of the County exercising its legislative authority to impose age restrictions on land use. Plaintiffs contend that the County's use of its zoning power to impose age restrictions on the residential use of real property violates various statutory and constitutional provisions of state and federal law.

### A. S.C.D. Zoning

Plaintiffs in this action live in various locations within the unincorporated areas of the County of Riverside. In these areas, land use is restricted by zoning regulations passed by the County of Riverside's Board of Supervisors. Specifically in issue is Section 18.7 of County Ordinance 348, first added to Ordinance 348 in 1978 ("Section 18.7").

#### 1. Section 18.7

Section 18.7 imposes age restrictions on entire areas of land subject to the County's geographical jurisdiction. Although the specific age restrictions contained in Section 18.7 have changed through the years, at all times the restrictions applied only to occupied dwelling units in areas whose zone classification symbol was followed by the suffix "S.C.D." (e.g., R–1–S.C.D.).

#### a. Section 18.7: March, 15, 1978 – September 12, 1991

The County originally enacted Section 18.7 on February 14, 1978. It went into effect on March 15, 1978. From March 15, 1978 to September 12, 1991, Section 18.7 required that "each dwelling unit in [areas whose zoning symbol includes the suffix S.C.D.], that is occupied, . . . be occupied by at least one person not less than 50 years of age and no person under 18 years of age shall permanently reside in any dwelling unit in the zoned area."

#### b. Section 18.7: September 12, 1991 – May 19, 1993

The County amended Section 18.7 on August 14, 1991, and this amendment went into effect on September 12, 1991. From September 12, 1991 to May 19, 1993, Section 18.7 required that "each dwelling unit in [areas whose zoning symbol includes the suffix S.C.D.], that is occupied, . . . be occupied in accordance with the 'housing for older persons' provisions of the Fair Housing Amendments Act of 1988 (42 U.S.C. § 3607), as they now exist and as they may from time to time be amended."

#### c. Section 18.7: May 19, 1993 – Present

The County again amended Section 18.7 on April 20, 1993, and this amendment went into effect on May 19, 1993. Since May 19, 1993, Section 18.7 has required that "each dwelling unit in [areas whose zoning symbol includes the suffix S.C.D.], that is occupied, . . . be occupied solely by persons 55 years of age or older in accordance with the 'housing for older persons' provisions of the Fair Housing Amendments Act of 1988 (42 U.S.C. § 3607), as they now exist and as they may from time to time be amended."

### 2. Areas Zoned as S.C.D.

There are four areas within the County of Riverside zoned as S.C.D. which are relevant to this action. They are known, at least for the purposes of this litigation, as Sun City, Hemet, Golf Knolls, and Air Force Village West.

Sun City is the largest of the areas zoned as S.C.D. which are relevant to this action. The Sun City S.C.D. zone contains several thousand units of single family tract homes, at least three mobile home parks, and apartments and condominium units.[1] The Hemet S.C.D. zone contains two housing areas: a mobilehome park and a single family tract development known as Palm Gardens. All together, there are approximately 96 dwelling units within the Hemet S.C.D. zone. The Golf Knolls S.C.D. zone contains approximately 400 dwellings, comprised of mobilehomes and manufactured homes. The Air Force Village West S.C.D. zone contains approximately 400 dwelling units, comprised of duplex townhomes and apartments.

### 3. Enforcement of Section 18.7

The County of Riverside has taken some action to enforce Section 18.7's limitations. Between June 28, 1989 and March 21, 1994, the County through its agents sent approximately 72 communications to occupants of residences suspected of allowing individuals who did not meet Section 18.7's age restrictions to reside at that location. The communications, consisting of "Notices of Reported Violations" and "Notices of Violations," set forth Section 18.7's age restrictions and informed the recipient residents of their suspected violations. No communications were sent in 1990 or 1991, and approximately 57% of the communications sent since May 19, 1993 (i.e., 13 of 23) incorrectly characterized the age restriction as being 50-or-older, not 55-or-older.

## B. The Parties

### 1. Defendants

Plaintiffs name five defendants in their first amended complaint: the County of Riverside ("the County"), Larry Parrish ("Parrish"), Thomas Ingram ("Ingram"), Scott Barber ("Barber"), and Joseph Tronti ("Tronti").[2] Defendant Parrish is the Chief Administrative Officer of the County; he is sued in his individual and official capacities. Defendant Ingram is the Director of Building and Safety for the County; he is sued in his individual and official capacities. Defendant Barber is the Supervising Code Enforcement Officer for the County; he is sued in his individual and official capacities. Defendant Tronti is a Senior Code Enforcement Officer with the County; he is sued in his individual and official capacities.

### 2. Plaintiffs

#### a. Individually–Named Plaintiffs

There are seven individually-named plaintiffs in this action. They are Douglas Arnold Gibson ("Douglas Gibson"). Douglas Arnold Gibson, Administrator of the Estate of Diane Marie Gibson ("Diane Gibson"), Dustin Gibson, Daniel Gibson, Lucille Mayo, and James Russell Dittmar

---

**1.** The parties dispute how many dwelling units lie within Sun City. Plaintiffs allege that there are at least 6382. The County disputes this figure, but offers only approximations as to the correct number.

**2.** The defendants are all represented by the same counsel, and neither plaintiffs nor defendants direct their arguments or defenses toward the specific actions of any particular individually-named defendant. Therefore, the Court will refer to the defendants collectively as "the County" within this order unless otherwise noted.

(collectively, "Plaintiffs"). Plaintiffs Douglas Gibson and his wife Diane Gibson live with their two minor sons, Dustin Gibson and Daniel Gibson (collectively, "the Gibsons"), in a house owned by Diane Gibson in Sun City. Plaintiff James Russell Dittmar, Sr. owns and lives in a home in Sun City with his wife, Helen, and his minor son Steven. Plaintiff Lucille Mayo resides in Hemet with her grandson Craig Flynn, a minor child.

### b. The Class

On September 18, 1995, the Court granted Plaintiffs' motion for class certification, finding that Plaintiffs had satisfied at least the requirements of Rule 23(b)(2) of the Federal Rules of Civil Procedure. The Court certified a class comprised of:

(1) all families with minor children who, since March 12, 1989, have been threatened with citation or eviction from their dwellings or cited or evicted from their dwellings by defendants for violation of section 18.7 of Riverside County Ordinance Number 348, which prohibits, or has been interpreted by defendants to prohibit, families with minor children from occupying a dwelling in certain areas of Riverside County; and

(2) all persons who, since January 1, 1985, because of their age or because of the age of other residents of their household, have been threatened with eviction or evicted from their dwellings by defendants for violation of section 18.7 of Riverside County Ordinance Number 348, which prohibits, or has been interpreted by defendants to prohibit, persons from occupying a dwelling in certain areas of Riverside County on the basis of their age.

The Court limited the class action portion of the case to determination of:

(1) all questions on which entry of injunctive or declaratory relief rests;

(2) all questions relating to defendants' liability for punitive damages (and the amount thereof if found liable);

(3) Plaintiffs' entitlement to, and the amount of their, attorneys' fees; and

(4) all other questions regarding defendants' liability to the named plaintiffs and the members of the class, except for those questions which relate to proof of the causality, existence, and amount of specific compensatory damages due to individual plaintiffs.

### C. Procedural Background

Plaintiffs filed a complaint against the County on May 9, 1994, and a first amended complaint ("FAC") on March 29, 1995. The FAC alleges that the County's actions in enacting, enforcing, and refusing to repeal Section 18.7 of Ordinance 348 give rise to claim for relief based on (1) the Fair Housing Act, 42 U.S.C. §§ 3601–3631(FHA); (2) the California Fair Employment and Housing Act, Cal.Gov.Code §§ 12900–12995 (FEHA); (3) the California Unruh Civil Rights Act, Cal.Civ.Code §§ 51–53 (Unruh Act); (4) federal constitutional substantive due process, (5) state constitutional substantive due process, (6) federal constitutional equal protection, (7) state constitutional equal protection, (8) state constitutional procedural due process, (9) state constitutional right of privacy, (10) federal constitutional freedom of association, (11) state constitutional freedom of association, (12) state law of inverse condemnation (i.e., a taking of property without just compensation), (13) state law of estoppel by nonconforming use rights, and (14) state law of estoppel by exceeding zoning authority. Plaintiffs seek compensatory and punitive damages, a declaratory judgment that the County's actions are unlawful, injunctive relief, costs, and reasonable attorneys' fees.

On November 6, 1995, Plaintiffs filed a motion for partial summary judgment. Plaintiffs sought summary adjudication rulings on thirty-three legal issues underlying their numerous claims for relief against the County. On July 22, 1996, the Court granted in part Plaintiffs' motion for partial summary judgment. The Court concluded that Section 18.7 of Ordinance 348 was null and void because as of January 1, 1995, California Government Code § 65008(a) ("section 65008(a)") declares any zoning decision by a county to be "null and void" if it denies to anyone the enjoyment of residence because of age. The Court permanently enjoined the County "from denying to any person on the basis of age the enjoyment of residence, landownership, tenancy or other land use through the use of its zoning or planning functions." The Court did not adjudicate any of the other issues raised by the parties' motions.

Three days after the Court filed its order and issued the injunction, on July 25, 1996, then California Governor Pete Wilson signed into law an amendment to section 65008. The amendment added subsection (e)(1) ("subsection (e)(1)"), which provides that, "Notwithstanding the above, nothing in this section or this title shall be construed to prohibit ... [¶] ... [t]he County of Riverside from enacting and enforcing zoning to provide housing for older persons, in accordance with state or federal law, if that zoning was enacted prior to January 1, 1995." The County filed a motion seeking reconsideration of the Court's July 22, 1996 order in light of the amendment. The Court denied defendant's motion for reconsideration on March 11, 1997, finding that, in amending section 65008, the California legislature exceeded its constitutional powers by imposing specific zoning classifications on land, a power reserved exclusively to counties and cities under the California Constitution.

The County appealed, and on December 31, 1997, the Ninth Circuit reversed in part, remanding the action for further proceedings. *See Gibson v. County of Riverside,* 132 F.3d 1311 (9th Cir.1997).

The Ninth Circuit held that the Court was correct in its original conclusion that section 65008(a) rendered section 18.7 null and void, *see id.* at 1313, but that it erred in concluding that the 1996 amendment to section 65008 exceeded the California legislature's constitutional authority. *See id.* The Ninth Circuit vacated the injunction entered by the Court on July 22, 1996 in its entirety. *See id.* at 1314. On remand, the parties briefed the effect of the Ninth Circuit's decision, as well as the effect that intervening changes in, and interpretations of, law have had on their motions for partial summary judgment.

Presently before the Court are the cross-motions for partial summary judgment originally filed on November 6, 1995. Plaintiffs seek summary adjudication rulings that defendants' actions, in enacting and enforcing senior zoning in the unincorporated areas of the County of Riverside, are—or were—violations of (1) California Government Code § 65008, (2) the Fair Housing Act, 42 U.S.C. §§ 3601–3631; (3) California's Unruh Civil Rights Act, Cal. Civ.Code §§ 51–53; and (4) Plaintiff's fundamental rights to familial privacy, intimate association, equal protection, and substantive due process as guaranteed by the United States and/or California Constitutions. Plaintiffs also seek summary adjudication rulings that Defendants are not entitled to certain statutory defenses to the alleged statutory violations, and that Plaintiffs have nonconforming use rights in their property to the extent the County's zoning practices are presently legal.

The County seeks partial summary judgment on all of Plaintiffs' claims alleg-

ing that (1) its zoning practices are—and were—legal under state and federal law; (2) Plaintiffs have failed to satisfy certain procedural prerequisites for their state-law claims; and (3) certain defendants are entitled to immunity from any award of damages.[3]

## II.

### EVIDENTIARY OBJECTIONS

Plaintiffs make 148 independent objections to the evidence offered by the County in support of its motion and in opposition to Plaintiffs' motion. Because the Court will not rely on much of the evidence to which Plaintiffs object, the Court will not address Plaintiffs' specific objections to this evidence. The Court will, however, address Plaintiffs' objections to the declaration submitted by Gregg Breed ("Breed") and the chart of information contained therein.[4]

The primary purpose of the Breed declaration is to introduce a chart which the County contends is evidence of its compliance with a requirement imposed by the Fair Housing Act on entities wishing to qualify as 55–or–over "housing for older persons."[5] The requirement is that 80 percent of the dwelling units within an area seeking to qualify as 55–or–over housing for older persons be occupied by at least one person aged 55 or over. *See* 42 U.S.C. § 3607(b)(2)(C). With his declaration, Breed presents a chart which purports to demonstrate that over 80 percent of the dwelling units in the four areas zoned S.C.D. are occupied by at least one person aged 55 or older. Essentially, this chart is the only evidence that the County submits in support of an essential element of its affirmative defense to liability under the Fair Housing Act.

The chart is a compilation of data the County gathered concerning the residents of dwelling units in the four areas zoned as S.C.D. According to Breed, "The data concerning Air Force Village West in Riverside was provided by Maj. Gen. Farris (U.S.Ret.), President and Administrator of Air Force Village West," and the data concerning the other areas came from two sources: responses that the County received from questionnaires sent to residents within those areas and from "follow-up investigative work done by Hearn Investigative Services (as described in paragraph five of Kent Livingston's declaration . . .)." In his declaration, Keith Livingston ("Livingston")[6] states the following (and nothing more) concerning the questionnaires and the follow up investigative work done by Hearn Investigative Services ("Hearn"):

4. In approximately June of 1994, I coordinated the preparation and delivery of a questionnaire survey to residents at

---

3. Because the simultaneously filed cross motions addressed the same claims the court has considered the appropriate evidentiary material identified and submitted in support of both motions and in opposition to both motions before ruling on each of them.

4. Breed is the Principal Risk and Insurance Analyst for the Risk Management Division of the County of Riverside. During his tenure in this position, he has done extensive compiling and tabulating of data by computer.

5. As discussed *infra,* entities which qualify as housing for older persons are free to discriminate against families with children. All other entities are prohibited from such discrimination.

6. Livingston is an Account Executive for Professional Risk Management, the claims administrator for the County of Riverside. Since this action was filed, he has responsibility for overseeing the handling of this claim and oversaw the County's collection of data regarding resident age in areas subject to the County's age restriction.

the zoned locations in Sun City, Murrieta, Hemet, and Air Force Village West. A true and correct copy of this questionnaire is attached as Exhibit A to this declaration.

5. Follow-up investigation was conducted by Hearn Investigative Services of Riverside, California in the summer of 1995. Hearn focused on the non-responders to the survey, including researching for death certificates of the apparently-deceased.

Breed does not indicate in his declaration what percentage of the information in the chart came from responses to the questionnaires and what percentage came from the follow-up investigative work done by Hearn. It is also not Clear from any of the evidence submitted by the County how many dwellings exist in the areas zoned as S.C.D. or what is the percentage of the dwellings in the areas zoned as S.C.D. The County has information about (e.g., what percentage of recipients of the questionnaire responded).[7]

The questionnaires asked recipients to list the name, age, date of birth, and length of residence of the residents in the dwelling and required that the questionnaire be signed under penalty of perjury. Livingston asserts in his deposition that the questionnaires were sent to all addresses within the areas zoned as S.C.D. When sent to the dwellings in the four areas zoned as S.C.D., each questionnaire was accompanied by a letter on the letter-

head of Kay Ceniceros, who at that time was a member of the Board of Supervisors for the County of Riverside. It stated as follows:

Dear Resident:

The County of Riverside has been sued in United States District Court because of its attempts to enforce and keep the senior citizen's zoning ordinance that covers the area in which you live. The County wishes to successfully defend this ordinance, on your behalf, but needs help in doing so.

You will find enclosed a questionnaire that will allow the County and its attorneys to compile the necessary statistical information to properly defend senior citizen zoning. Would you please answer the questionnaire immediately and return it to us in the enclosed envelope at your earliest possible convenience?

Your prompt assistance is very much appreciated. We regret the intrusion into your privacy, but this information is the only way we can uphold the zoning ordinance that all of you benefit from. We thank you for your support.

Though the County seems to have shared the responses to the questionnaires with Plaintiffs, it did not, prior to filing its motion for partial summary judgment, disclose the results of the follow-up investigation conducted by Hearn. In fact, beyond paragraph five of the Livingston declaration, the County does not disclose the methods employed in, or results of, the

---

7. The County has submitted the declaration of Jerald Udinsky ("Udinsky"), a professor of economics at the University of California, Berkeley. Udinsky offers an opinion concerning the significance of the percentages set forth in the chart contained in the Breed declaration. He also makes reference to the amount of parcels contained in the areas zoned as S.C.D. and the percentage of dwellings that responded to Defendants' questionnaires. Udinsky's declaration, however, indi-

cates that he was given this information by others and that he had no involvement in the determination of how many dwellings exist in the S.C.D. areas or in the distribution of the questionnaires. Thus, while Udinsky may rely on that information to set forth an opinion and may testify as to it in that context (to the extent such information is of the kind which experts in his field reasonably rely), *see* Fed.R.Evid. 703, he has no basis to testify as to the truth of that information.

follow-up investigation conducted by Hearn.

Plaintiffs object to the County's submission of the chart summarizing the responses to the questionnaires and the results of the follow-up investigation performed by Hearn. The County contends that the chart is admissible pursuant to both Rule 1006 of the Federal Rules of Evidence ("Rule 1006") as a summary of otherwise admissible evidence and pursuant to Rule 803(8)(C) of the Federal Rules of Evidence ("Rule 803(8)(C)") as a public record or report.

## A. Rule 1006

Rule 1006 permits parties to present a chart or summary of data where the data is so voluminous that the data cannot conveniently be examined in court. *See* Fed. R.Evid. 1006. Plaintiffs do not dispute that the data summarized in the chart contained in the Breed declaration is so voluminous that the data cannot conveniently be examined in court. Instead, Plaintiffs contend that in order for the summary of data to be admissible pursuant to Rule 1006, the data itself must be admissible and the data must be made available to Plaintiffs prior to its introduction in summary form. Plaintiffs argue that neither requirement is met here. First, Plaintiffs state that the responses to the questionnaires are hearsay and therefore inadmissible. Second, Plaintiffs assert that the County did not disclose to them the results of the follow-up investigation conducted by Hearn, prior to filing the summary in support of its motion for partial summary judgment.

■ Plaintiffs are correct in their statement of the law. In order for a summary of data to be admissible pursuant to Rule 1006, "[the] proponent of [the] summary must show that (1) the underlying materials on which [the] summary was based are admissible, and (2) underlying documents were made available to [the] opposing party for inspection prior to their introduction." *See United States v. Miller,* 771 F.2d 1219, 1238 (9th Cir.1985) (citing *Paddack v. Dave Christensen, Inc.,* 745 F.2d 1254, 1259 (9th Cir.1984)); *accord Amarel v. Connell,* 102 F.3d 1494, 1516 (9th Cir. 1996). Thus, the chart contained in the Breed declaration will be inadmissible pursuant to Rule 1006 if the County fails to establish the admissibility of the data summarized therein or if the County failed to make the underlying data available to Plaintiffs prior to filing its motion for partial summary judgment.

### 1. Admissibility of the Responses to the Questionnaires

■ The County does not contest Plaintiffs' assertion that the responses to the questionnaires are hearsay. The County argues instead that the responses fall within numerous exceptions to the hearsay bar and are thus admissible. First, the County argues that they fall within the exception for "records of vital statistics." *See* Fed.R.Evid. 803(9). Pursuant to this exception, "[r]ecords or data compilations, in any form, of births, fetal deaths, deaths, or marriages [are not excluded by the hearsay rule], if the report thereof was made to a public office *pursuant to requirements of law." Id.* (emphasis added). This exception is inapplicable however since the responses to the questionnaires were not "made to a public office *pursuant to requirements of law."* As the cover letter accompanying the questionnaires demonstrates, whether to answer the questionnaire was a voluntary choice, not a requirement.

■ Second, the County argues that the responses are admissible as "statements of personal or family history." This exception excepts from the hearsay bar an indi-

vidual's statements concerning his or her own (or a relative's) birth, *see* Fed.R.Evid. 804(b)(4), but applies only where the declarant is unavailable within the meaning of Rule 804(a). The burden of establishing unavailability is on the party seeking the introduction of the out-of-court statement. *See* 31 Michael H. Graham, Federal Practice and Procedure: Evidence § 6792, at 554 (1997). The County asserts that the respondents to the survey are "unavailable in practical terms, given that it would be infeasible to have thousands of separate declarants." "Unavailability in practical terms," however, is not one of the enumerated categories set forth in Rule 804(a) which defines what it means to be unavailable as a witness for purposes of the 804(b) exceptions. Thus, the County may not avail itself of the "statement of personal or family history" exception.

■ Finally, the County argues that the responses to the questionnaires fall within the "residual" exception to the hearsay rule found in Rule 807 of the Federal Rules of Evidence ("Rule 807"). Rule 807 states:

A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party

with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

Thus, "[t]o be admissible pursuant to the residual exception, the evidence must fulfill five requirements: trustworthiness, materiality, probative importance, the interests of justice and notice." *See Parsons v. Honeywell, Inc.,* 929 F.2d 901, 907 (2d Cir.1991).

■ To satisfy the "circumstantial guarantees of trustworthiness" requirement of Rule 807, the survey of residents within the areas zoned as S.C.D. must have been conducted in accordance with generally accepted principles. *Pittsburgh Press Club v. United States,* 579 F.2d 751, 758 (3d Cir.1978); *accord Keith v. Volpe,* 858 F.2d 467, 480 (9th Cir.1988); *Harolds Stores, Inc. v. Dillard Dep't Stores,* 82 F.3d 1533, 1544 (10th Cir.1996). Technical and methodological deficiencies in the survey typically bear on the weight of evidence, not on its admissibility. *See Volpe,* 858 F.2d at 480; *Harolds Stores,* 82 F.3d at 1544. However, substantial deficiencies in the design or execution of a survey of individuals is grounds for its complete exclusion. *See Harolds Stores,* 82 F.3d at 1544; *Pittsburgh Press,* 579 F.2d at 759–60.

In *Pittsburgh Press,* the Third Circuit set forth the following standards for assessing whether a survey of individuals had been conducted in accordance with generally accepted principles:

A proper universe must be examined and a *representative* sample must be chosen; the persons conducting the survey must be experts; the data must be properly gathered and accurately reported. It is essential that the sample design, the questionnaires and the manner of interviewing meet the standards of objective surveying and statistical

techniques. Just as important, the survey must be conducted independently of the attorneys involved in the litigation. The interviewers or sample designers should, of course, be trained, and ideally should be unaware of the purposes of the survey or the litigation. *A fortiori,* the *respondents* should be similarly unaware.

*Pittsburgh Press,* 579 F.2d at 758 (emphasis in original); *accord Lutheran Mut. Life Ins. Co. v. United States,* 816 F.2d 376, 378 (8th Cir.1987).

Here, as in *Pittsburgh Press,* there are lacking the essential hallmarks of reliability which have made surveys admissible in other cases. To begin, the survey was not conducted by experts or independently of the attorneys involved in the litigation. Instead, the deposition of Livingston—submitted by Plaintiffs with their objections to the County's evidence—reveals that the questions on the questionnaire were written by an attorney for the County and that Livingston identified the residences to which the questionnaire would be sent. More importantly, the recipients of the survey were informed of the purpose of the survey and reminded that they were the beneficiaries of the survey. This is exactly the situation that the *Pittsburgh Press* court found so egregious.

In *Pittsburgh Press,* the Pittsburgh Press Club ("the Club") was seeking a refund of taxes paid to the Internal Revenue Service. In order to qualify, the Club had to establish a particular use of their building facilities. In particular, the Club had to establish that the facilities were used primarily for the benefit of Club members. Like the County here, the Club sent a questionnaire to its members which asked them about their use of the Club's facilities. And again like the County here, with the questionnaire the Club sent a cover letter which said in part:

Dear Member:

As you may know, the Pittsburgh Press Club has been engaged in a prolonged dispute with the Internal Revenue Service regarding the Club's status as an exempt organization. Part of that controversy has been favorably resolved by the rulings of the United States District Court here in Pittsburgh and the United States Court of Appeals for the Third Circuit.

As yet unresolved and sent back for further hearing in the District Court is that part of the dispute which deals with revenues resulting from certain parties, banquets, or meeting functions (hereinafter referred to as affairs) held from 1966 through 1971 in the Banquet and Meeting Room facilities of the Club.

The purpose of this letter is to seek your assistance in gathering information to enable the Press Club to obtain a refund of income taxes paid under protest for the years 1966 through 1971. . . .

The results of the survey will be used by our expert witnesses and lawyers to establish statistical opinions as to the character of the use of the Club.

. . . . [*Id.* at 756 n. 7.]

Not surprisingly, the results of the survey were positive for the Club.

The *Pittsburgh Press* court found that the cover letter which informed the recipients of the questionnaires of the questionnaire's purpose irrevocably undermined the reliability of the survey's results:

The respondents, who were all Club members and thus interested in the litigation, were told the precise nature of the litigation and the purpose of the survey. They consequently knew which responses would be helpful to the PPC, and conversely, which would be harmful. Moreover, it was possible that a recipient of the questionnaire would fail to

respond because he knew an honest response would be harmful to the Club's position. Thus the respondents might have contained a higher percentage of those who could answer in a way helpful to the Club.

It therefore appears that PPC's survey suffers from a severe dearth of circumstantial guarantees of trustworthiness.... The respondents were all interested in PPC's prevailing in the lawsuit. Yet they were expressly advised about the nature of the litigation and the survey, as well as which answers would benefit the Club. [*Id.* at 759.]

Because of these deficiencies, the Third Circuit held that it was beyond the district court's discretion to consider the survey and that the district court thus erred in considering it as admissible evidence. *See id.* at 759–60.

The same concerns are present here. First, instead of employing an expert, the County and its attorneys designed and executed the survey. Second, many of the recipients of the questionnaire had a vested interest in keeping S.C.D. zoning in place, and they were informed before filling out the survey that responding to the survey could help in this effort. Third, despite the notice on the questionnaire that, "The above information is confidential and will be used for statistical purposes only," those respondents who could not meet the age restrictions imposed by Section 18.7 would likely be fearful that

they would be identifying themselves as lawbreakers if they returned their questionnaires. Thus, the reliability of the results of the survey is irrevocably undermined as in *Pittsburgh Paints.*

The deficiencies are substantial and fundamental; they are not merely technical. In short, the circumstantial guarantees of trustworthiness required by Rule 807 for the responses to the questionnaires to be excepted from the hearsay bar are lacking. *See id.*[8] Thus, the Court finds that the survey responses are inadmissible hearsay. Because the data underlying the chart in the Breed declaration is inadmissible as hearsay,[9] the summary of the data is also inadmissible pursuant to Rule 1006. On this basis, the Court sustains Plaintiffs' objection to the County's submission of the chart contained in the Breed declaration pursuant to Rule 1006.

### 2. The County's Failure To Make the Results of the Follow–Up Investigation Available to Plaintiffs

■ For a separate and independent reason, the Court sustains Plaintiffs' objection to the County's introduction, pursuant to Rule 1006, of the chart contained in the Breed declaration. According to the County, the chart contains information gathered by the follow-up investigation performed by Hearn. Yet, the County did not provide the results of this investigation to Plaintiffs prior to their submission of the chart the content of which was based,

---

**8.** In addition to *Pittsburgh Paints,* three other courts have held as inadmissible surveys conducted by the parties themselves (or their attorneys) where the subjects of the survey where made aware of the purpose of the survey. *See Lutheran Mutual,* 816 F.2d at 378–79; *Delgado v. McTighe,* 91 F.R.D. 76, 80–81 (E.D.Pa.1981); *Berman v. New Hampshire Jockey Club,* 324 F.Supp. 1156, 1168 (D.N.H.1971). The Court has found no cases to the contrary.

**9.** The Court notes that the County has not explained what the results of the follow-up investigation performed by Hearn were. Without such explanation, the Court cannot assess whether the results are admissible or subject to some evidentiary bar. Thus, as to this data also, the County has failed to satisfy its burden of establishing its admissibility.

in part, on this information. The County has not even detailed with *any* particularity the methods employed in the investigation or its results. For a summary of data to be admissible, the party seeking its admission must make the data underlying the summary available to the other party prior to its introduction. *See Miller,* 771 F.2d at 1238. Defendants have failed to meet this requirement, and thus the summary is inadmissible pursuant to Rule 1006 for this reason also. Accordingly, on this basis also, the Court sustains Plaintiffs' objection to the County's submission of the chart contained in the Breed declaration pursuant to Rule 1006.

### B. Rule 803(8)(C): Public Records and Reports

Plaintiffs also object to the County's submission of the chart contained in the Breed declaration pursuant to the "public records and reports" exception to the hearsay bar contained in Rule 803(8)(C). In civil actions and proceedings, Rule 803(8)(C) excludes from the hearsay bar "factual findings [and summaries thereof] resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." *Volpe,* 858 F.2d at 481 (quoting Fed. R.Evid. 803(8)(C)). The proponent of evidence submitted pursuant to this rule—in this case, the County—must show that the factual findings resulted from an investigation made pursuant to authority granted by law. If the proponent meets this burden, the factual findings will be presumed to be sufficiently trustworthy to overcome the hearsay bar unless the opponent of the findings' submission—in this case, Plaintiffs—establishes that the sources of information or other circumstances indicate lack of trustworthiness. *See Volpe,* 858 F.2d at 481.

Though the questionnaires were prepared only after Defendants were sued, the fact that the County had an independent obligation to ascertain the proportion of residences occupied by at least one person aged 55 years or older makes the results of the questionnaires "factual findings resulting from an investigation made pursuant to authority granted by law" within the meaning of Rule 803(8)(C). *See id.* at 481–82. Thus, they are presumed to be admissible pursuant to Rule 803(8)(C) unless Plaintiffs satisfy their burden of demonstrating that the "sources of information or other circumstances indicate lack of trustworthiness." *See id.* at 481.

For the reasons discussed above, the Court finds that Plaintiffs have satisfied this burden. The method of distributing the questionnaires employed by the County severely undermines the trustworthiness of the results. Moreover, the failure of the County to share with Plaintiffs (or the Court) the results of the follow-up investigation conducted by Hearn calls the trustworthiness of these results into question also. Accordingly, the Court sustains Plaintiffs' objection to the submission of the chart in the Breed declaration pursuant to Rule 803(8)(C).

### C. Rule 403

Plaintiffs also object, pursuant to Rule 403 of the Federal Rules of Civil Procedure ("Rule 403"), to the submission of the chart contained in the Breed declaration because, according to Plaintiffs, the chart's probative value is substantially outweighed by the danger that it will mislead the jury. *See* Fed.R.Evid. 403 (allowing federal district courts to exclude evidence where its probative value is substantially outweighed by the danger of misleading the jury). The Court agrees that the chart's probative value is substantially outweighed by the chance that it will mislead the jury for

the reasons stated above and for one additional reason. The Court finds that the probative value of the chart is fundamentally limited by Defendants' failure to include, even in response to Plaintiffs' objections, any explanation of how the data and presumptions underlying the chart contained in the Breed declaration were derived. For example, Defendants have not established with any degree of certainty how many dwellings exist in the areas zoned as S.C.D.[10] Nor have they explained what percentage of recipients of the questionnaire responded, what follow-up investigatory efforts were performed by Hearn, or the results of the follow-up investigation. Without this information, the chart has little, if any, probative value, and the danger that a jury would be misled by the results contained therein is great. Accordingly, the Court also sustains Plaintiffs' objection to the County's submission of the chart contained in the Breed declaration pursuant to Rule 403.

## III.

### UNDISPUTED MATERIAL FACTS

Following are undisputed material facts supported by admissible evidence. Plaintiffs Douglas Gibson and his wife Diane Gibson live with their two minor sons, Dustin Gibson and Daniel Gibson (collectively, "the Gibsons"), in a house owned by Diane Gibson in Sun City.[11] Diane Gibson inherited the home from an aunt who died on January 23, 1991. The family first began occupying the house in late November, 1991. Sun City was S.C.D.-zoned at the time Ms. Gibson's aunt died in January, 1991, as well as when the Gibsons

began occupying the house later that year. At the time the cross motions for partial summary judgment were first filed on November 6, 1995, Douglas Gibson was age 41; Diane Gibson was age 35; Daniel Gibson was age 16; and Dustin Gibson was age 11.

In July, 1992, the County caused a Notice of Reported Violation of the County's senior citizen zoning to be served on the Gibsons ("July Notice"). The July Notice described the reported violation as "the occupancy of a dwelling unit by a person or persons under 55 years of age" and stated that the appropriate response to the reported violation would be "restricting the occupancy of [the] dwelling unit to persons 55 years of age or older."

On January 21, 1993, the County caused a Notice of Violation to be served on the Gibsons ("January Notice"). The January Notice stated that the Gibsons had been "found to be in violation of ... Section 18.7: The occupancy of a Dwelling Unit in the Senior Citizen Development Zoning area by a person or persons under 55 years of age." The January Notice directed the Gibsons to comply with Section 18.7 by "restricting occupancy of Dwelling to persons 55 years and older IMMEDIATELY." The January Notice also stated, "A FOLLOW-UP INVESTIGATION WILL BE CONDUCTED ON OR ABOUT *3/22/93*. FAILURE TO COMPLY BY THIS DATE COULD RESULT IN THE ISSUANCE OF A CITATION. PENALTY FOR FAILURE TO COMPLY[:] UPON CONVICTION, THERE WILL BE A FINE OF $100 FOR THE FIRST OFFENSE, $200 FOR THE SECOND

---

**10.** Defendants, in fact, have given Plaintiffs substantially different "estimates" of how many dwellings exist in the areas zoned as S.C.D.

**11.** Daniel Gibson is the biological child of plaintiff Douglas Gibson from his first marriage. Dustin Gibson is the biological son of Douglas and Diane Gibson. Douglas Gibson has been appointed guardian ad litem for Daniel and Dustin.

AND $1000, OR SIX (6) MONTHS IN JAIL, OR BOTH, FOR THE THIRD OFFENSE."

On March 23, 1993, the County served Plaintiff Douglas Gibson with a Notice to Appear in Court Nontraffic ("Notice to Appear") which described Douglas Gibson's alleged criminal violation as "Ord. 348 sec. 18.7 The Occupancy of a dwelling in the Senior Zone, by a person under 55 years of age." Thereafter, Gibson challenged the legality of the County's age-based zoning. This challenge caused the County to seek information from the Sun City Civic Association which the County needed to establish Section 18.7's compliance with the Fair Housing Act. In a letter dated April 27, 1994, Pamela J. Anderson, Deputy County Counsel, noted the urgency of the County's request:

It is therefore extremely important that we receive the above information and documentation at our office no later than May 3, 1994. If we do not receive such information and documentation by this date, we will dismiss the infraction citation in the [Gibson] case, rather than risk the invalidation of our ordinance.

I hope you can appreciate the urgency of this matter as I would hate [for] the word to get out that the County cannot enforce the Senior Citizen Zoning Ordinance because we cannot show that the housing in Sun City qualifies as "housing for older persons" under the Federal Fair Housing Act.

Unable to compile the appropriate information establishing the County's compliance with the Fair Housing Act, the County dropped the charges against Gibson on May 4, 1994.[12]

## IV.

## ANALYSIS

This is a complicated case that has become more complicated during the time in which it has been pending before the Court. Plaintiffs asserts that the County's S.C.D. zoning scheme discriminates on the basis of age and familial status in such a way as to violate California Government Code § 65008(a), the Fair Housing Act, California's Unruh Civil Rights Act ("Unruh Act"), and the guarantees of privacy afforded by the United States and California Constitutions. However, during the course of this litigation, the standards for determining what conduct violates the Fair Housing Act, the Unruh Act, and California Government Code § 65008(a) have changed numerous times with the changes affecting, at least in part, the relief Plaintiffs seek against the County.

What is not at issue in this case is the ability of private land owners living within the County of Riverside to establish housing developments for senior citizens which discriminate on the basis of age and familial status. Federal and state law clearly affords them this right, provided that they

12. Pursuant to the supplemental responses to Plaintiffs' request for admissions dated November 15, 1995, the Court determines the following facts are also undisputed material facts: (1) at no time prior to May 4, 1994, did defendants or any other agent, employee, official, or contractor of the defendant Riverside County make any investigation or analysis to determine whether any of the housing units zoned by Riverside County for senior citizen occupancy, pursuant to Section 18.7, qualified as housing for older persons within the meaning of the Federal Fair Housing Act, 42 U.S.C. § 3607(b); and (2) as of November 15, 1995, the County had insufficient information to admit or deny that, during the period of March 12, 1989 to November 15, 1995, the owner or manager of the housing units zoned as S.C.D. published and adhered to policies and procedures demonstrating an intent to provide housing for older persons within the meaning of 42 U.S.C. § 3607(b) or used any form of age verification procedure.

meet certain statutory requirements. What is at issue is the authority of the County of Riverside, a governmental entity, in the exercise of its zoning power, enacting legislation to set aside areas within its jurisdiction, in which areas there are approximately 7,000 dwelling units and where only persons who are 55 years of age or older may live.

Plaintiffs contend that (1) the federal and state statutory and regulatory schemes which allow private owners to establish and enforce age-based restrictions in limited situations do not contemplate or permit large-scale age-based zoning such as that enacted and implemented by the County pursuant to Section 18.7;[13] (2) to the extent that age-based zoning is permissible under federal and state statutory law, the County has failed to satisfy the statutory requirements which would make it legal; and (3) to the extent that the County's zoning satisfies federal and state statutory requirements, age-based zoning, as applied to such a large number of dwellings, violates the guarantees of privacy afforded to Plaintiffs by the United States and California Constitutions.[14] The County contends that the age requirements contained in Section 18.7 are contemplated by federal and state law, satisfy all federal and state statutory requirements, and do not violate the guarantees of privacy afforded by the United States and California Constitutions.

The Court has read and carefully considered the parties' exhaustive briefing as to each of these three issues. Ultimately, the Court concludes that to the extent that federal and state law permits age-based zoning, the County has failed to satisfy the requirements which the County acknowledges it must satisfy in order for such zoning to be valid. Accordingly, the Court will not adjudicate in this order any issues concerning the abstract permissibility, under state and federal law, of age-based zoning or the constitutionality of the County's age-based zoning scheme. *County Court of Ulster County, N.Y. v. Allen*, 442 U.S. 140, 154, 99 S.Ct. 2213, 2223, 60 L.Ed.2d 777 (1979) (plurality). ("Federal courts are courts of limited jurisdiction. They have the authority to adjudicate specific controversies between adverse litigants over which and over whom they have

---

**13.** At least two district courts have held that, under the Fair Housing Act, a municipality cannot compel owners within a zoned area to manage their property as housing for older persons. *See Mobile Home Village, Inc. v. Township of Jackson*, Civil No. 95–0004, Fair Housing–Fair Lending (P–H) ¶ 16,018, at 16,-018.4 (D.N.J. June 14, 1995); *Cedar Hills Developers, Inc. v. Township of Wyckoff*, Civil No. 89–5391, Fair Housing–Fair Lending (P–H) ¶ 15,675, at 16,467–68 (D.N.J. Dec. 11, 1990). According to the *Mobile Home Village court*, "The FHA exclusively grants discretion regarding the method of compliance [with the HOP requirements] to the 'owner or manager' [of a property]. 42 U.S.C. § 3607(b)(2). The owner or manager may either provide housing on a nondiscriminatory basis or show that it is entitled to an exemption. Jackson Township cannot compel plaintiff to meet the requirements of the FHA exemption."

The conclusions of these courts seem to be contradicted by the latest regulations interpreting the FHA. *See* Implementation of the Housing for Older Persons Act of 1995, 63 Fed.Reg. 16,324, 16,327 (1999) (noting that, in HUD's view, municipal zoning was a permissible way to establish HOP).

**14.** *See, e.g., Schmidt v. Superior Court*, 48 Cal.3d 370, 388–90, 256 Cal.Rptr. 750, 769 P.2d 932 (1989) (strongly suggesting that a zoning ordinance would violate the California Constitution if it imposed, as opposed to permitted, age restrictions which precluded families with children from residing in areas greater than or equal in size to a "neighborhood"); *cf. City of Santa Barbara v. Adamson*, 27 Cal.3d 123, 133, 164 Cal.Rptr. 539, 610 P.2d 436 (1980) ("In general, zoning ordinances are much less suspect when they focus on the use than when they command inquiry into who are the users.").

jurisdiction. In the exercise of that authority, they have a duty to decide constitutional questions when necessary to dispose of the litigation before them. But they have an equally strong duty to avoid constitutional issues that need not be resolved in order to determine the rights of the parties to the case under consideration."); *Campos v. Nail,* 43 F.3d 1285, 1288–89 (9th Cir.1994) ("[A] federal court should not decide federal constitutional questions where a dispositive nonconstitutional ground is available.") (quoting *Hagans v. Lavine,* 415 U.S. 528, 547, 94 S.Ct. 1372, 1384, 39 L.Ed.2d 577 (1974)).

## A. Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, a district court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c).

Supreme Court and Ninth Circuit precedent establish the following standards for consideration of such motions: "If the party moving for summary judgment meets its initial burden of identifying for the court the portions of the materials on file that it believes demonstrates the absence of any genuine issue of material fact," the burden of production then shifts so that "the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, *'specific facts* showing that there is a genuine issue for trial.'" *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987) (quoting Fed. R.Civ.P. 56(e)) (emphasis added in court opinion) (citations omitted). With respect to these specific facts offered by the nonmoving party, the court does not make

credibility determinations or weigh conflicting evidence, and is required to draw all inferences in a light most favorable to the non-moving party. *See id.* at 630–31.

Rule 56(c) nevertheless requires this Court to enter summary judgment, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The mere existence of a scintilla of evidence in support of the non-moving party's position [is] insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In order to defeat a motion for summary judgment, the plaintiff must present "significant probative evidence tending to support the complaint." *T.W. Elec. Serv.,* 809 F.2d at 630. This court thus applies to either party's motion for summary judgment the same standard as for a motion for directed verdict: "[W]hether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505.

## B. Fair Housing Act

Through passage of the Fair Housing Act ("the FHA"), 42 U.S.C. §§ 3601–3631, Congress sought to "provide ... for fair housing throughout the United States." 42 U.S.C. § 3601. In order to achieve this goal, Congress created a statutory cause of action for any person "aggrieved" by a discriminatory housing practice. *See id.* § 3613(a)(1)(A). Prior to 1989, the FHA prohibited certain discriminatory housing

practices when based on race, color, religion, sex, or national origin. These practices include (1) making dwellings unavailable based on race, etc., *id.* § 3604(a); (2) discriminating in the terms of sale or rental of a dwelling based on race, etc., *id.* § 3604(b); (3) printing or publishing advertisements or notices with respect to the sale or rental of a dwelling indicating any preference, limitation, or discrimination based on race, color, religion, sex or national origin, *id.* § 3604(c); and (4) coercing, intimidating, threatening, or interfering with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, any right granted or protected by section 3604. *Id.* § 3617.

In 1989, Congress added "familial status" to the list of characteristics upon which the discriminatory housing practices enumerated above could not be based.[15] The addition was motivated by a concern that housing opportunities were not sufficiently available to persons with children. However, in making discrimination based on familial status illegal, Congress provided an exception for certain housing developments termed "housing for older persons" ("HOP"). Under the FHA, housing developments which qualify as HOP are free to discriminate based on familial status, *see* 42 U.S.C. § 3607(b)(1) ("[No] provision in this subchapter regarding familial status appl[ies] with respect to housing for older persons."), to the extent that such discrimination is otherwise permissible under federal and state law.

There are three types of HOP which are excepted from the FHA's prohibition on familial-status based discrimination. The first is housing provided under any State or Federal program that the Secretary of Housing and Urban Development ("Secretary") determines is specifically designed and operated to assist elderly persons. *See id.* § 3607(b)(2)(A). The second is housing intended for, and solely occupied by, persons 62 years of age or older. *See id.* § 3607(b)(2)(B). The third is "[housing] intended and operated for occupancy by at least one person 55 years of age or older per unit" ("55–or–older HOP"). *See id.* § 3607(b)(2)(C). Most, if not all, of the reported court decisions concerning HOP concern this third category of HOP, as does this case.

At the direction of Congress, the Secretary developed regulations which helped define what housing developments could qualify as 55–or–older HOP. In so directing, however, Congress set forth three threshold requirements that had to be met, in addition to any requirements that the Secretary imposed, by any housing development seeking to qualify as 55–or–older HOP. *See id.* § 3607(b)(2)(C) ("In determining whether housing qualifies as housing for older persons under this subsection, the Secretary shall develop regulations which require *at least* the following factors: ....") (emphasis added). These threshold requirements were: (1) the existence of significant facilities and services specifically designed to meet the physical or social needs of older persons; (2) the occupation of at least 80 percent of the units by at least one person 55 years of age or older; and (3) the publication of, and adherence to, policies and procedures which demonstrate an intent by the owner

---

15. For purposes of the FHA, "familial status" means, "one or more individuals (who have not attained the age of 18 years) being domiciled with—(1) a parent or another person having legal custody of such individual or individuals; or (2) the designee of such parent or other person having such custody, with the written permission of such parent or other person." 42 U.S.C. § 3602(k).

or manager to provide housing for persons 55 years of age or older.[16]

Status as HOP is an affirmative defense for which Defendants have the burden of persuasion. *See Hogar Agua y Vida en el Desierto, Inc. v. Suarez–Medina*, 36 F.3d 177, 182 n. 4 (1st Cir.1994); *Massaro v. Mainlands Section 1 & 2 Civic Assoc., Inc.*, 3 F.3d 1472, 1475 (11th Cir.1993). As an exception to the general rule prohibiting discrimination, the exception is construed narrowly. *See Massaro*, 3 F.3d at 1475; *cf. City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 731, 115 S.Ct. 1776, 131 L.Ed.2d 801 (1995) (noting the FHA's " 'broad and inclusive' compass" and construing another exception within the FHA "narrowly in order to preserve the primary operation of the [statute's anti-discriminatory provisions]") (quoted cases omitted). In order to have the benefit of the defense, an entity claiming it must satisfy all three of the threshold requirements. *See, e.g., Massaro* 3 F.3d at

1482 (holding that homeowners association was not eligible for the exemption where it failed to satisfy the "policies and procedures" test). The entity, moreover, must demonstrate that it satisfied these elements at the time the alleged discriminatory acts took place, pursuant to the statutes and regulations then in effect. *See Covey*, 116 F.3d at 839.

■ Plaintiffs contend that many of the County's actions violate the FHA's prohibition on familial-status based discrimination and seek summary adjudication rulings to that effect. These actions include the County's imposition of S.C.D. zoning as well as the County's enforcement of the limitations imposed by the zoning. The County does not contest that these actions violate the general anti-discriminatory provisions of the FHA. The County contends, however, that it is not prohibited from discriminating based on familial status since, according to the County, it has satisfied the statutory prerequisites to qualify

16. On December 28, 1995, Congress changed the threshold requirements for housing seeking to qualify as 55–or–older HOP, and on April 2, 1999, the Secretary issued regulations interpreting the post-December 28, 1995 requirements for entities seeking to qualify as 55–or–over HOP. While the parties have briefed what they consider to be the effect of these changes on their respective positions, the Court finds this briefing largely irrelevant to the issues framed for adjudication by the parties in their respective motions for summary judgment.

The motions deal with predicate acts of discrimination which occurred prior to December 28, 1995. In *Covey v. Hollydale Mobilehome Estates*, 116 F.3d 830 (9th Cir.1997), the Ninth Circuit held that any changes made by Congress' December 28, 1995 amendment to the statutory requirements that entities seeking to qualify as 55–or–over HOP must meet could not be applied retroactively. *See id.* at 839. Similarly, the Secretary states in the comments accompanying the April 2, 1999 regulations that the regulations should

not be applied retroactively. *See* Implementation of the Housing for Older Persons Act of 1995, 63 Fed.Reg. 16,324, 16,325 (1999) ("Therefore, a matter involving a claim of alleged discrimination occurring *before* December 28, 1995 will be covered by those laws and regulations in effect at the time of the claimed violation."). Thus, the December 28, 1995 amendment and the April 2, 1999 regulations have no effect on whether Defendants qualified as 55–or–over HOP at the relevant times of this dispute (i.e., prior to December 28, 1995).

The statutory and regulatory changes would affect Plaintiffs' ability to obtain injunctive relief pursuant to the FHA, to the extent that Defendants' zoning scheme complies with the present requirements imposed by the FHA. However, because the Court concludes that Plaintiffs' are entitled to injunctive relief pursuant to state law, it need not—and will not—evaluate whether Defendants comply with the post December 28, 1995 requirements imposed on those seeking to qualify as 55–or–over HOP under FHA.

the S.C.D.-zoned areas as 55–or–older HOP. The County seeks summary judgment on all of Plaintiffs' FHA claims on this ground.

For two independent reasons, the Court concludes as a matter of law that the County did not qualify as 55–or–over HOP at any time from March 12, 1989 to November 6, 1995. First, the County has failed to present sufficient probative evidence to establish as a genuine issue of fact that at any time during that period, eighty percent of the dwelling units in the areas zoned as S.C.D. were occupied by at least one person aged 55 or over. Second, the County has offered no evidence that at any time during that period it adhered to policies and procedures demonstrating its intent to provide housing for persons 55 years or older. The Court also concludes as a matter of law that the County did not qualify as 55–or–over HOP from March 12, 1989 to May 19, 1993 for a third reason. During that period, the County failed to publish a policy and procedure which sufficiently demonstrated its intent to provide housing for persons 55 years or older.

### 1. The Eighty Percent Requirement

In order to establish a genuine issue of fact regarding the affirmative defense to familial status discrimination that qualifying as 55–or–over HOP provides, the County must present significant probative evidence that eighty percent of the dwellings within the areas zoned as S.C.D. were occupied or were reserved for occupancy by at least one person aged 55 or over. *See* 42 U.S.C. §§ 3607(b)(2)(C)(ii) & 3607(b)(3)(B). The County, however, has submitted no admissible evidence from which a reasonable jury could find in its favor as to this requirement.[17] Without such evidence, the County did not qualify as 55–or–over HOP for the subject periods of time. Accordingly, on this basis, the Court will deny the County's motion for summary judgment on Plaintiffs' FHA

---

**17.** In its evidentiary rulings, for the reasons stated therein, the Court excluded from consideration the chart accompanying the Breed declaration in its entirety. In light of this ruling, the Court also finds that the Udinsky declaration does not provide sufficient evidence upon which a reasonable jury could return a verdict in the County's favor as to this issue.

In his declaration Udinsky sets forth several opinions concerning the statistical significance of the figures contained in the chart accompanying the Breed declaration. Udinsky's opinions, however, are completely dependent on factual assumptions which the County has not supported in any way with admissible evidence.

For example, Udinsky states in paragraph nine that, "At this time, I have found no reason to believe that this procedure [i.e., the survey and its responses] was non-random in any way. Assuming, as above, that the number of dwelling units in the Sun City SCD zone was 5,720, then one can be 99.99% confident that at least 99.4% of the total units in the Sun City SCD was occupied by at least one senior as of March 12, 1989."

This opinion is dependent upon the factual assumptions that there are 5,720 dwelling units in the Sun City SCD zone and that the County's survey procedure was not non-random in any way. The County has not, however, submitted admissible evidence supporting either of these factual assumptions. In fact, the Court determined earlier in its evidentiary rulings that the procedure employed by the County in distributing the survey questionnaires most likely affected the responses thereafter received.

Without evidentiary support for these factual assumptions (which Udinsky himself does not provide in his declaration), the opinions Udinsky renders in his declaration concerning the statistical significance of the figures contained in the chart accompanying the Breed declaration lack any relevancy as to whether eighty percent of the dwellings in the areas zoned as S.C.D. were occupied by at least one person aged 55 or over.

claims, and will grant Plaintiffs' motion for a summary adjudication ruling that the County, as a matter of law, did not qualify for the 55–or–older HOP exemption at any time between March 12, 1989, the date on which familial-status discrimination became illegal under the FHA, and November 6, 1995, the date on which the County submitted evidence purporting to demonstrate its compliance with the FHA's requirements for 55–or–older HOP.

### 2. *"Publication Of, And Adherence To Policies And Procedures Which Demonstrate an Intent by The Owner or Manager to Provide Housing For Persons 55 Years of Age or Older"*

In order to establish the affirmative defense to familial status discrimination that qualifying as 55–or–over HOP provides, the County must present uncontradicted admissible evidence that it published and adhered to policies and procedures demonstrating its intent to provide housing for persons 55 years of age or older. *See* 42

U.S.C. § 3607(b)(2)(C)(iii). The requirement is joint; it requires the "publication of, *and* adherence to, policies *and* procedures which demonstrate an intent by the owner or manager to provide housing for persons 55 years of age or older." *Id.* (emphasis added).

It is not enough that the person claiming the exemption published a policy demonstrating its intent to provide housing for persons 55 years of age or older if the entity did not adhere to a procedure demonstrating the same intent. Similarly, it is not enough that the person seeking to claim the exemption adhered in fact to a procedure of only accepting persons over 55 as residents or occupants where the entity failed to publish such policy. *See United States v. City of Hayward,* 36 F.3d 832, 838 (9th Cir.1994) (holding that a mobilehome park could not qualify as HOP where its written policy was 18–or–older even though park attempted to enforce 55–or–older policy). Failing to satisfy *either* requirement deprives an entity of the ability to qualify as 55–or–older HOP. *See id.*[18]

**18.** Although some cases refer to this requirement as the "intent test," such a label—despite being convenient shorthand—tends to misrepresent the requirements imposed by 42 U.S.C. § 3607(b)(2)(C)(iii). The question is whether the person claiming the 55–or–over HOP exemption published and adhered to policies and procedures demonstrating its intent to provide 55–or–over HOP, not merely whether it had such an intent. The "policies and procedures" requirement is thus prophylactic in nature. It requires a person seeking to qualify as 55–or–older HOP to take the affirmative steps set forth in 42 U.S.C. § 3607(b)(2)(C)(iii) (i.e., publication and adherence to policies and procedures) in advance of its engaging in familial-status based discrimination and prevents the person from claiming the exemption to the extent that it failed to take these steps. *See City of Hayward,* 36 F.3d at 838. To the extent the person publishes and adheres to sufficient policies and procedures, that person will have

demonstrated its "intent" to provide housing for persons 55 years of age or older.

The County points to language within the Appendix accompanying the April 2, 1999 regulations interpreting the December 28, 1995 statutory amendments to the FHA which it says supports its position that it satisfied the "intent test" by merely affixing the S.C.D. label to zoning maps. However, as noted earlier, the April 2, 1999 regulations and the Appendix thereto have no affect on this Court's interpretation of the statutory requirements which existed prior to December 28, 1995. Moreover, the Court notes that the Secretary's ability to draft regulations which deviate from 42 U.S.C. § 3607(b)(2)(C)'s statutory language was restricted prior to December 28, 1995. *See id.* § 3607(b)(2)(C) ("In determining whether housing qualifies as housing for older persons under this subsection, the Secretary shall develop regulations which require *at least* the following factors: . . . .") (emphasis added).

### a. The County Did Not Adhere to Procedures Demonstrating Its Intent To Provide Housing for Persons 55 Years of Age or Older.

To satisfy the "procedures" requirement, an entity seeking to qualify as 55–or–older HOP must have an effective procedure in place to ensure its compliance with the statutory and regulatory prerequisites for qualifying as 55–or–older HOP. Typically, such a procedure involves some kind of age-verification. *See Massaro*, 3 F.3d at 1478–79; *Simovits v. Chanticleer Condominium Ass'n*, 933 F.Supp. 1394, 1402–03 (N.D.Ill.1996). The procedure must exist prior to the allegedly discriminatory acts and must have some degree of reliability. *See Massaro*, 3 F.3d at 1478–79; *Simovits*, 933 F.Supp. at 1403. Finally, the procedure must be performed on a consistent basis. *See Simovits*, 933 F.Supp. at 1403.

Prior to, and at the time of, the discriminatory acts alleged by Plaintiffs, the County did not have in place *any* "procedure" to assure its compliance with the statutory and regulatory prerequisites for qualifying as 55–or–older HOP. For example, until this lawsuit was initiated, it took no action to verify the ages of the residents in the areas zoned as S.C.D. The County itself readily admits by way of a request for admission: "At no time prior to May 4, 1994, did defendants or any other agent, employee, official, or contractor of the defendant Riverside County make any investigation or analysis to determine whether any of the housing units zoned by Riverside County of senior citizen occupancy, pursuant to Section 18.6 or 18.7 of Ordinance No. 348, qualified as housing for older persons within the meaning of the Federal Fair Housing Act, 42 U.S.C., Section 3607(b)."

It is true that the uncontradicted evidence reveals that the County, through its agents, did investigate, on occasion, complaints of zoning violations including complaints that residences in S.C.D.-zoned areas were being occupied by individuals who did not satisfy Section 18.7's age requirements. The County has submitted as evidence copies of 72 communications sent between June 28, 1989 and March 21, 1994 to residences suspected of being occupied by such individuals. These communications consist of "Notices of Reported Violations" and "Notices of Violations." A review of these communications indicates that (1) none were sent in 1990 or 1991; (2) many of the "Notices of Reported Violations" were sent in response to written complaints to the County and not as a result of any systematized investigatory procedure of the County; and (3) approximately 57% of the communications sent since May 19, 1993 (i.e., 13 of 23) characterized the age restriction as being 50–or–older, not 55–or–older.

These actions do not satisfy the statutory requirements of Section 3607(b)(2) in that they were neither sufficiently reliable to insure the County's compliance with the FHA's HOP provisions nor performed on a consistent basis. *See Massaro*, 3 F.3d at 1478–79; *Simovits*, 933 F.Supp. at 1403. Moreover, those communications which characterized the age restriction as being 50–or–older, not 55–or–older, do not reflect an intent to provide housing for individuals 55 years of age or older. In short, a reasonable jury could not find from this evidence that the County, at any time between March 12, 1989 and November 6, 1995, adhered to a procedure demonstrating its intent to provide housing for persons 55 years of age or older.

The County attempts to rely on actions taken by various associations in the four S.C.D.-zoned areas to satisfy the "proce-

dures" requirement.[19] Evidence submitted by the County suggests that these associations had in place at least some age-verification procedures at the time of the allegedly discriminatory actions taken by the County.[20] While such actions may be relevant to whether the associations can independently qualify for the 55–or–older HOP exemption, they have no legal bearing on whether the County's zoning practices meet the procedures requirement.

Of the three statutory requirements that must be met by entities seeking to qualify as 55–or–older HOP, the "policies and procedures" requirement is the one that most explicitly focuses on the actions of the entity seeking to claim the HOP exemption. *See, e.g., Massaro,* 3 F.3d at 1478 (holding that district court was correct in disregarding regulatory factors that did not relate to actions which could be undertaken by the entity claiming the 55–or–older HOP exemption itself). By requiring that an entity seeking 55–or–over HOP status publish and adhere to policies and procedures which demonstrate that *entity's* intent to provide housing for persons 55 years of age or older, Congress sought to preclude entities accused of discrimination based on familial status from retroactively claiming the HOP exemption because of the fortuitous actions of others.

The "policies and procedures" requirement, thus, ensures that entities seeking the exemption have made a conscious decision, on a going forward basis, to be 55–or–older HOP and that the entities have taken steps to ensure their compliance with the statutory and regulatory requirements. For this reason, the entity claiming the exemption cannot rely on the actions of unrelated third parties, of which the entity was not aware, to satisfy the "procedures" requirement. *Cf. Park Place Home Brokers v. P–K Mobile Home Park,* 773 F.Supp. 46, 52 (N.D.Ohio 1991) (holding that mobile home parks seeking to qualify for an HOP exemption could not rely upon closely-located off-site facilities to satisfy the requirement that there be "significant facilities and services specifically designed to meet the physical or social needs of older persons" where location of parks was "merely fortuitous" and there was "no evidence that defendants chose the location of the parks with an eye to providing ... housing to elderly people").

The County relies on *Massaro,* 3 F.3d at 1478–79, for the proposition that the actions of homeowners' associations, and committees thereof, can be relevant in determining whether an entity has satisfied the "policies and procedures" requirement. The County's reliance on Massaro is misplaced. In *Massaro,* the actions of a committee of a homeowners' association were relevant to determine whether the homeowners' association had satisfied the "policies and procedures" requirement, but this relevance arose from the committee's affiliation with the homeowner's association (i.e., the committee was a committee of the homeowners' association).

Here, the County did not present any evidence that there was an active relationship between the associations in the

**19.** Although the County attempts to rely upon actions of these associations in order to satisfy its "policies and procedures" obligations under the FHA, it conveniently disclaims any liability for actions of these associations to the extent that such actions violated the Unruh Act. In the County's words, such actions "cannot properly be viewed as the exercise of governmental power." *See* Mem. of P. & A. in Supp. of Defs.' Mot. for Partial Summ.J., at 24 n. 8.

**20.** Plaintiffs object, on many grounds, to the admissibility of this evidence. However, in light of the Court's resolution of this issue, the Court need not and will not address these evidentiary objections.

S.C.D.-zoned areas and the County. The County has submitted no evidence that it had knowledge of these associations' actions prior to the alleged discriminatory acts. In fact, 17 months after the action was initiated, the County—even after "reasonable inquiry"—had insufficient information or knowledge to admit or deny whether the owner or manager of any of the housing units in any of the S.C.D.-zoned areas had independently published and adhered to policies and procedures demonstrating an intent to provide housing for older persons within the meaning of 42 U.S.C. § 3607 during the time period of March 12, 1989 to September 29, 1995. The County is thus precluded from relying upon the actions of these associations to satisfy the statutory requirement that it adhere to procedures demonstrating its intent to provide housing for persons 55 years of age or older.

In sum, no reasonable trier-of-fact could conclude from the evidence submitted by the County that it adhered to procedures demonstrating its intent to provide housing for persons 55 years of age or older. The only reasonable conclusion based on the evidence submitted by the parties is that the County did not have in place such a procedure, let alone adhere to it. Accordingly, on this basis, the Court will deny the County's motion for partial summary judgment on Plaintiffs' FHA claims, and will grant Plaintiffs' motion for a summary adjudication to the effect that the County, as a matter of law, did not qualify for the 55–or–older HOP exemption at any time between March 12, 1989, the date on which familial-status discrimination became illegal under the FHA, and November 6, 1995, the date on which the County submitted evidence purporting to demonstrate its compliance with the FHA's requirements for 55–or–older HOP.

### b. From March 12, 1989 to May 19, 1993, the County Failed To Publish a Policy Demonstrating Its Intent To Provide Housing for Persons 55 Years of Age or Older.

For a separate reason, the Court concludes that the County's S.C.D.-zoning scheme was not eligible for the 55–or–older HOP exemption from March 12, 1989 to May 19, 1993. During this time period, entities seeking to qualify for the HOP exemption were required, among other things, to publish and adhere to policies and procedures demonstrating its intent to provide housing for persons 55 years of age or older. As noted above, the requirement is joint; it requires the "publication of, *and* adherence to, policies *and* procedures which demonstrate an intent by the owner or manager to provide housing for persons 55 years of age or older." 42 U.S.C. § 3607(b)(2)(C)(iii) (emphasis added). Thus, in addition to adherence to a procedure, the statute requires publication of a policy demonstrating the entity's intent to provide housing for persons 55 years of age or older. *See City of Hayward*, 36 F.3d at 838 (finding that a mobilehome park could not qualify as HOP where its written policy was 18 or older even though park enforced a 55 or older policy). The requirement is a minimal one. Yet, strangely, the uncontroverted evidence shows that it took the County four years to satisfy it.

The first version of Section 18.7 did not constitute a published policy demonstrating an intent by the County to provide housing for persons 55 years of age or older. To demonstrate the required intent, the County's "rules and regulations must explicitly restrict residency to persons fifty-five years or older." *Simovits*, 933 F.Supp. at 1403; *cf. City of Hayward*, 36 F.3d at 838. Yet, the first version of Section 18.7, in effect from March 15, 1978

until September 12, 1991, required residency of at least one person 50 years of age or older, not 55 years of age or older. Such a rule, as a matter or law, cannot, and did not, constitute a published policy demonstrating the County's intent to provide housing for persons 55 years of age or older.[21]

The second version of Section 18.7 also did not constitute a published policy demonstrating the County's intent to provide housing for persons 55 years of age or older. This version, in effect from September 12, 1991 to May 19, 1993, required that "each dwelling unit in [areas whose zoning symbol includes the suffix S.C.D.], that is occupied, . . . be occupied in accordance with the 'housing for older persons' provisions of the Fair Housing Amendments Act of 1988 (42 U.S.C. § 3607), as they now exist and as they may from time to time be amended." Yet, there are three ways to qualify as housing for older persons under 42 U.S.C. § 3607, only one of which pertains to providing housing for persons 55 years of age or older. As a matter of law, a written policy which requires compliance with the " 'housing for older persons' provisions " does not satisfy the requirement that there be published a policy demonstrating an intent to provide housing for persons 55 years of age or older. *See Simovits*, 933 F.Supp. at 1403.

The third version of Section 18.7 does constitute publication of a policy demonstrating the County's intent to provide housing for persons 55 years of age or older. This version, in effect since May 19, 1993, requires that "each dwelling unit in [areas whose zoning symbol includes the suffix S.C.D.], that is occupied, . . . be occupied solely by persons 55 years of age or older in accordance with the 'housing for older persons' provisions of the Fair Housing Amendments Act of 1988 (42 U.S.C. § 3607), as they now exist and as they may from time to time be amended."

Plaintiffs argue that the current Section 18.7 is too restrictive. Under the FHA, an entity seeking to qualify as 55–or–older HOP need only require that at least *one* person in each dwelling be 55 years or older. According to Plaintiffs, the current Section 18.7 undermines this requirement by mandating that *each* resident in a dwelling be 55 years or older. There is, however, no textual basis for Plaintiffs' argument. Unlike section 51.3 of the Unruh Act, which explicitly prohibits entities claiming the Unruh Act's HOP exemption from instituting and enforcing policies which are more restrictive than those proscribed by the Act, *see* Cal.Civ.Code § 51.3(d) (discussed *infra*), section 3607(b)(2)(C) does not. Two courts, in fact, have found blanket 55–or–older polices permissible under section

---

**21.** Instead of conceding that a policy of 50–or–over violates the FHA's prohibition on familial-status based discrimination, the County makes the specious argument that because 50–or–over is "less restrictive" than 55–or–over, it "must" be permissible under the FHA. The County misinterprets the nature of HOP under the FHA. Although Congress provided for HOP at the same time it prohibited familial-status based discrimination, it did not place the two on equal footing. Prohibition of familial-status based discrimination is the primary goal, and HOP is an exception to the goal. For this reason, the exception must be construed narrowly, and its requirements must be strictly met. Allowing 50–or–older housing is only less restrictive with regard to people who wish to live away from the "burdens" of families with children. It is not "less restrictive" with regard to families with children looking for homes in which to live, since more housing would be able to qualify for the exemption, leaving less housing for families with children. If the County's argument were accepted, 45–or–over, 40–or–over, or even 25–or–over housing all would be permissible since they are "less restrictive" than 55–or–over housing. This is simply not the case.

3607(b)(2)(C). *See Town of Northborough v. Collins,* 38 Mass.App.Ct. 978, 653 N.E.2d 598 (Mass.1995); *Colony Cove Assoc. v. Brown,* 220 Cal.App.3d 195, 269 Cal.Rptr. 234 (1990). Thus, the current Section 18.7 satisfies the requirement that the County publish a policy demonstrating its intent to provide housing for persons 55 years of age or older.

As a matter of law, the County's first two versions of Section 18.7, in effect from March 12, 1989 to May 19, 1993 did not constitute a published policy demonstrating the County's intent to provide housing for persons 55 years of age or older. Because publication of such a policy is a necessary prerequisite for an entity to qualify as 55–or–older HOP, on this ground also, the Court will deny the County's motion for partial summary judgment as to Plaintiffs' FHA claims, and will grant Plaintiffs' motion for a summary adjudication ruling that the County, as a matter of law, did not qualify for the 55–or–older HOP exemption at any time between March 12, 1989, the date on which familial-status discrimination became illegal under the FHA, and May 19, 1993, the day on which the third version of Section 18.7 went into effect.

### 2. The County's Actions in Enacting and Enforcing Each Version of Section 18.7 Violate the Fair Housing Act.

Plaintiffs contend, and have sought summary adjudication rulings determining, that the County's actions in enacting and enforcing Section 18.7 violate the FHA in a variety of ways: (1) by "mak[ing] unavailable ... dwelling[s] to any person because of ... familial status," 42 U.S.C. § 3607(a); (2) by "discriminat[ing] against any person in the terms, conditions, or privileges of sale or rental of a dwelling ... because of ... familial status," *id.* § 3607(b); (3) by

"mak[ing], print[ing], or publish[ing], or caus[ing] to be made, printed, or published any notice [or] statement ... with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on ... familial status ..., or an intention to make any such preference, limitation, or discrimination," *id.* § 3604(c); and (4) by "coerc[ing], intimidat[ing], threaten[ing], or interfer[ing] with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, ... any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." *Id.* § 3617. Beyond asserting that the County qualifies as HOP, a status which would exempt it from the FHA's ban on familial-status-based discrimination, the County does not contest Plaintiffs' assertions that its actions violate the FHA.

"[I]t is well-settled that the [Fair Housing Act] prohibits discriminatory land use decisions by municipalities...." *Oxford House, Inc. v. Township of Cherry Hill,* 799 F.Supp. 450, 458 (D.N.J.1992); *Keith v. Volpe,* 858 F.2d 467, 482 (9th Cir.1988) ("The [Fair Housing] Act applies to municipalities."). It is also clear that in the absence of a statutory exemption, age restrictions like those contained in the subject three versions of Section 18.7 necessarily preclude persons with children from obtaining housing in County S.C.D.-zoned areas, and thus discriminate on the basis of familial status. Accordingly, because as a matter of law the County does not qualify as HOP, the Court concludes that the defendants' actions in enacting and enforcing Section 18.7, as a matter of law, violate the FHA in the following ways:

First, in enacting and enforcing each version of Section 18.7, the County made unavailable dwellings to Plaintiffs based on familial status in violation of 42 U.S.C. § 3604(a). Second, in enacting and enforc-

ing each version of Section 18.7, the County discriminated against Plaintiffs in the terms and conditions of sale and rental of dwellings based on familial status in violation of 42 U.S.C. § 3604(b). Third, in enacting and enforcing each version of Section 18.7, the County, in violation of 42 U.S.C. § 3617, interfered with Plaintiffs in their enjoyment of their right to be free from discrimination based on familial status. Fourth, in enacting each version of Section 18.7, the County published a statement with respect to the sale and rental of dwellings that indicated a preference based on familial status in violation of 42 U.S.C. § 3604(c). Fifth, in serving upon Plaintiffs Notices of Reported Violations and Notices of Violations containing Section 18.7's age-based restrictions, the County caused to be published statements with respect to the sale or rental of housing indicating a preference based on familial status in violation of 42 U.S.C. § 3604(c). Sixth, in causing to be served upon Plaintiffs Notices of Reported Violations and Notices of Violations containing Section 18.7's age-based restrictions, the County, in violation of 42 U.S.C. § 3617, coerced, intimidated, threatened, and interfered with Plaintiffs in their enjoyment of their right to be free from discrimination based on familial status. Seventh, by causing a Notice to Appear for a purported violation of Section 18.7 to be served upon Plaintiff Douglas Gibson, the County, in violation of 42 U.S.C. § 3617, coerced, intimidated, threatened, and interfered with Plaintiff Douglas Gibson's right to be free from discrimination based on familial status. Finally, because each version of Section 18.7 has purported to require or permit actions that are discriminatory under the FHA, each version has been invalid during all relevant periods pursuant to 42 U.S.C. § 3615.

Plaintiffs are entitled to injunctive relief and injunctive relief will be granted based on the foregoing violations of the FHA. 42 U.S.C. § 3613(c)(1); *Silver Sage Partners v. City of Desert Hot Springs* 251 F.3d 814, 826–7 (9th Cir.2001).

## C. California's Unruh and Fair Employment and Housing Acts

Plaintiffs contend that the County's enforcement of Section 18.7's age-based restrictions also violates the Unruh Act and the Fair Employment and Housing Act ("the FEHA"). For these violations, Plaintiffs seek damages as well as declaratory and injunctive relief. The County contends that (1) Plaintiffs' state-law claims are barred by their failure to file a claim, pursuant to the California Governmental Claims Act, (California Claims Act) with the County prior to filing suit; (2) Plaintiffs' state-law claims are barred by their failure to commence this action within the 120–day statute of limitations contained in California Government Code § 65009(c); (3) the Unruh Act does not constrain its ability to discriminate based on age through zoning; (4) Section 18.7 qualifies as "housing for senior citizens" pursuant to California Civil Code § 51.3 and is thus exempt from the FEHA's prohibition on familial-status based discrimination and the Unruh Act's prohibition on age-based discrimination (to the extent that the Unruh Act applies to it); and (5) to the extent its actions are illegal under either the FEHA or the Unruh Act, provisions of the California Claims Act shield it and the individually-named defendants from any award of damages.

### 1. Plaintiffs Were Not Required To File a Written Claim with the County Prior to Filing the State Claims.

Preliminarily, the Court determines that Plaintiffs were not required to file a written claim pursuant to the California Claims Act prior to commencing this

action. California Government Code § 945.4 provides that, "[N]o suit *for money or damages* may be brought against a public entity ... until a written claim therefor has been presented to the public entity and has been acted upon by the board, or has been deemed to have been rejected by the board ...." (Emphasis added). However, Plaintiffs' FAC primarily seeks declaratory and injunctive relief, not damages. Plaintiffs want to stay in their homes and want the freedom to allow within their homes the residency of persons younger than 55 years of age. They also want the County to conform its actions to the mandates of state and federal housing laws. Their request for damages is ancillary to this request. In such circumstances, the California Claims Act does not require the filing of a claim with the governmental entity prior to commencing suit against it. *See Independent Housing Serv. v. Fillmore Ctr. Assoc.*, 840 F.Supp. 1328, 1358 (N.D.Cal.1993) ("[Plaintiffs'] potential damages are small and particularly inconsequential compared to the effect of the declarations it seeks. The court therefore finds that no statutory notice was required under the Tort Claims Act.").

### 2. Plaintiffs' State Law Claims Are Not Subject to a 120–Day Statute of Limitations.

The Court also concludes that Plaintiffs' state-law claims are not subject to the 120–day statute of limitations contained in California Government Code § 65009(c) ("section 65009(c)"). Section 65009(c) provides that,

[N]o action or proceedings shall be maintained in any of the following cases by any person unless the action or proceeding is commenced and service is made on the legislative body within [120][22] days after the legislative body's decision: [¶] (1) To attack, review, set aside, void, or annul the decision of a legislative body to adopt or amend a general or specific plan.... [¶] (2) To attack, review, set aside, void, or annul the decision of a legislative body to adopt or amend a zoning ordinance. [¶] (3) To determine the reasonableness, legality, or validity, of any decision to adopt or amend any regulation attached to a specific plan. [¶] (4) To attack, review, set aside, void, or annul the decision of a legislative body to adopt, amend, or modify a development agreement.

Plaintiffs' complaint does not attack any specific zoning *decision* of the County's. "Instead, [Plaintiffs] seek to resolve the [County's] fundamental misunderstanding of its responsibilities under the [Unruh Act and the FEHA] to avoid continued violations ... in the future." *Venice Town Council, Inc. v. City of Los Angeles*, 47 Cal.App.4th 1547, 1566, 55 Cal.Rptr.2d 465 (1996). When declaratory and injunctive relief is sought on such grounds, the 120–day statute of limitations contained in section 65009(c) is inapplicable. *See id.* at 1568, 55 Cal.Rptr.2d 465.

### 3. Plaintiffs' State Law Claims for Damages under the Unruh Act and the FEHA for Section 18.7's Enactment.[23]

The County asserts that to the extent that its actions do violate the Unruh Act or the FEHA, it, and the individually-named defendants are immune from liability for

---

**22.** The 120–day period was changed to 90 days after the commencement of this action.

**23.** For purposes of this section, the Court distinguishes between the County as a separate entity and the individually-named defendants. *Cf. supra* note 2. Thus, when the Court refers to "the County," it means only the County of Riverside as a public entity.

damages pursuant to various provisions of the California Claims Act. *See, e.g.,* Cal. Gov.Code §§ 815.2(b), 818.2, 820.4, 820.6, 821 & 821.6. When applicable, these grants of immunity preclude the imposition of damages on public employees and entities based upon statutes such as the FEHA and the Unruh Act. *See Caldwell v. Montoya,* 10 Cal.4th 972, 986, 42 Cal. Rptr.2d 842, 897 P.2d 1320 (1995) (holding that Cal.Gov.Code § 820.2, when applicable, precludes an award of damages against public employees under the FEHA); *Gates v. Superior Court,* 32 Cal. App.4th 481, 494, 38 Cal.Rptr.2d 489 (1995) (holding that Cal.Gov.Code § 845, when applicable, precludes an award of damages against public employees under the Unruh Act).

■ The Court concludes that various provisions of the California Claims Act do apply and do preclude certain claims for damages asserted by Plaintiffs pursuant to the FEHA or the Unruh Act. As a matter of law, the County and the individually-named defendants have immunity against any claim under the Unruh Act and the FEHA for damages based on their enactment of, and/or failure to repeal, each version of Section 18.7. Under California law, public entities have absolute immunity against claims for damages when premised upon their adoption, or failure to adopt, an enactment. *See* Cal.Gov.Code § 818.2 ("A public entity is not liable for an injury caused by adopting or failing to adopt an enactment. . . .") & 821 ("A public employee is not liable for an injury caused by his adoption of or failure to adopt an enactment. . . ."). Accordingly, the Court will grant all defendants' motion for partial summary judgment with regard to Plaintiffs' FEHA and Unruh Act claims insofar as they seek damages for the defendants' mere enactment of section 18.7.

■ The individually-named defendants also argue that they have immunity from any claim under the Unruh Act and the FEHA for damages based on their enforcement of Section 18.7. In general, under California law public employees are not liable for actions taken to enforce laws unless they act with malice or without due care or good faith. *See id.* §§ 820.4 ("A public employee is not liable for his act or omission, exercising due care, in the execution or enforcement of any law."), 820.6 ("If a public employee acts in good faith, without malice, and under apparent authority of an enactment that is unconstitutional, invalid, or inapplicable, he is not liable for an injury caused thereby except to the extent that he would have been liable had the enactment been constitutional, valid and applicable.") & 821.6 ("A public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause.").

■ The Court determines that the individually-named defendants have failed to submit significant probative evidence that would support a judgment in their favor as to the applicability of these immunities. Unlike sections 818.2 and 821, which provide an absolute immunity, sections 820.4 and 820.6 provide a qualified immunity available in many circumstances but unavailable where the defendant public employee failed to use due care and/or acted in bad faith or with malice. Defendants have the burden of proving their entitlement to this immunity. *See Cameron v. State of California,* 7 Cal.3d 318, 325, 102 Cal.Rptr. 305, 497 P.2d 777 (1972); 5 B.E. Witkin, California Procedure: Pleading § 1033, at 482 (4th ed.1997). This burden is one of production and persuasion. Defendants have not, however, submitted any

evidence demonstrating that any of the individually-named defendants acted without malice, or with due care or good faith. Therefore, as a matter of law, the individually-named defendants are not entitled to partial summary judgment as to Plaintiffs' FEHA and Unruh Act claims as they relate to their enforcement of § 18.7. Accordingly, the Court will deny the individually-named defendants motion for partial summary judgment with regard to Plaintiffs' FEHA and Unruh Act claims to the extent they seek damages for the individually-named defendants actions in enforcing Section 18.7.[24]

### 4. The County's Enforcement of Section 18.7's Age Restrictions Violates the Unruh Act.

California's Unruh Act provides broad protection against arbitrary discrimination. Its operative provision states that, "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, or disability are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Cal.Civ.Code § 51 ("section 51").

Although section 51 contains what might seem to be a finite list of protected categories, the California Supreme Court in a series of cases has found that the Unruh Act prohibits discrimination based on characteristics not specifically enumerated in section 51. For example, it has found that the Act prohibits discrimination against

homosexuals, *see Stoumen v. Reilly,* 37 Cal.2d 713, 716, 234 P.2d 969 (1951); "hippies" (or associates thereof), *see In re Cox,* 3 Cal.3d 205, 216, 90 Cal.Rptr. 24, 474 P.2d 992 (1970); and, as relevant here, families with children. *See Marina Point, Ltd. v. Wolfson,* 30 Cal.3d 721, 744, 180 Cal.Rptr. 496, 640 P.2d 115 (1982) (holding that apartment complex could not, under the Unruh Act, prohibit families with children); *O'Connor v. Village Green Owners Assoc.,* 33 Cal.3d 790, 792, 191 Cal.Rptr. 320, 662 P.2d 427 (1983) (holding that condominium owners association could not, under the Unruh Act, enforce restriction prohibiting residency by person under 18 years of age).

The California Supreme Court's analysis in *Marina Point* is particularly relevant to the present dispute. In holding that an apartment complex's policy against families with children violated the Unruh Act, the court noted that such discrimination might not always violate the Unruh Act. The court held that, in light of legislative enactments reflecting a public policy supportive of housing reserved for older persons, "age qualifications as to a housing facility reserved for older persons can operate as a reasonable and permissible means under the Unruh Act of establishing and preserving specialized facilities for those particularly in need of such services or environment." *Marina Point,* 30 Cal.3d at 742–43, 180 Cal.Rptr. 496, 640 P.2d 115.

The *Marina Point* court thus found that (1) section 51 of the Unruh Act, in and of

---

**24.** Even if the individually-named defendants were entitled to immunity, it is not at all clear that this immunity would extend to the County. Although California Government Code § 815.2(b) states that "a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liabili-

ty," this statute only provides the entity immunity where liability is grounded solely upon vicarious liability. *See Caldwell,* 10 Cal.4th at 989 n. 9, 42 Cal.Rptr.2d 842, 897 P.2d 1320. It does not apply where there is a basis for direct liability under the statute in question. *See id.*

itself, prohibits discrimination against persons with children but (2) there was implicit in federal and state law an exemption from this prohibition for housing designed to meet the specialized needs of senior citizens. The *Marina Point* court did not, however, set forth how an entity would qualify for this implied exemption. Instead, the California Legislature took the initiative in clarifying what housing facilities could qualify for the exemption discerned by the *Marina Point* court. *See* Cal.Civ.Code § 51.2 (stating that the intent of section 51.2 was "to clarify the holdings" in *Marina Point* and *O'Connor, supra.*)

In 1984, the legislature added California Civil Code §§ 51.2 and 51.3 to the Unruh Act ("sections 51.2 and 51.3"). Section 51.2 provides that, "Section 51 [of the Unruh Act] shall be construed to prohibit a business establishment from discriminating in the sale or rental of housing based upon age. [However, where] accommodations are designed to meet the physical and social needs of senior citizens, a business establishment may establish and preserve that housing for senior citizens, *pursuant to Section 51.3 . . . .*" (Emphasis added). Section 51.3, in turn, sets forth the requirements that must be met in order for a business establishment to discriminate based on age in the sale or renting of housing.

Section 51.3 provides for two types of residential developments that can qualify for the "housing for senior citizens" ("HSC") exemption to the Unruh Act's prohibition on discrimination based on age

or familial status.[25] The two types differ in what age the "anchor" or "qualifying" resident must be. *See* Cal.Civ.Code § 51.3(c)(1). In the first type, the anchor resident is 62 years or older. In the second, the anchor resident is 55 years or older. The County seeks to qualify as 55–or–older HSC (hereinafter, "HSC")

The County acknowledges that there are at least two requirements it must satisfy to qualify as HSC under section 51.3. First, the residential developments in question must have been "developed, substantially rehabilitated, or substantially renovated for, senior citizens" and meet certain size requirements (i.e., depending on the area in which the senior citizen housing development is located, a different minimum number of dwelling units is required of it). *See id.* §§ 51.3(c)(3). Second, the County's "written policy," which in this case is its actual zoning ordinance (i.e., Section 18.7), must conform to the restrictions set forth in section 51.3.

Section 51.3 significantly limits the ability of residential developments seeking to qualify as HSC to exclude certain categories of persons. To be sure, the development can, or in fact must, require that one person in each dwelling unit in the residential development be either 55 or older. However, the development cannot exclude, and the development's written policy cannot purport to exclude, the residency of certain other persons deemed "qualified permanent residents" by the Act, who by definition can be younger than 55.[26] According to section 51.3(d), "The

---

**25.** Though section 51.2 refers to this exemption as "housing for senior citizens," section 12955.9 of the Government Code labels the exemption as "housing for older persons." Because the Fair Housing Act's exemption is also labeled "housing for older persons," the Court for clarity purposes will refer to the

Unruh Act exemption as "housing for senior citizens" or "HSC."

**26.** A "qualified permanent resident" is a person who meets each of the following three requirements: (1) he or she was residing with the anchor resident "prior to the death, hospitalization, or other prolonged absence of, or the dissolution of marriage with [the anchor

covenants, conditions, and restrictions or other written documents or written policy *shall not* limit occupancy, residency, or use on the basis of age more proscriptively than to require that one person in residence in each dwelling unit may be required to be a senior citizen [i.e., 62 or older, or 55 or older living in a senior citizen housing development] and that each other resident in the same dwelling unit may be required to be a qualified permanent resident." (Emphasis added). In addition, the development's written policies must affirmatively permit the residency of "permitted health care residents" while they are providing care, *see id.* § 51.3(j),[27] and other temporary visitors, no matter what their age. *See id.* § 51.3(e).[28]

Plaintiffs seek a summary adjudication ruling that the County's enforcement of Section 18.7's age restrictions violates the Unruh Act. Plaintiffs contend that the County's age restrictions undermine the protections afforded by the Unruh Act and that the County does not qualify for the Act's HSC exemption. The County contends that its actions are not subject to the Unruh Act and, to the extent that they are, do not violate the Act since, according to the County, it qualifies for the HSC exemption.

## a. The Unruh Act Applies to the County and to the Individually–Named Defendants.

■ The County contends that the Unruh Act does not restrict its power to discriminate based on age because it is not a "business establishments" within the meaning of the Unruh Act. According to the County, even though all private parties constituting "business establishments" within the County of Riverside who do not qualify as HSC are prohibited by the Unruh Act from discriminating on the basis of age in the sale or rental of housing, it is not. In effect, the County claims that it has the legislative power to create an "Unruh Act Free Zone" where private housing developments which do not qualify as HSC need not provide the benefits reserved by the Unruh Act to housing developments which meet section 51.3's strict requirements.

The County's position is not supported by the text of the Unruh Act or by case law interpreting its scope. Moreover, if accepted, the County's position would provide a potentially large exception to the Act's protections.[29] For these reasons, the

resident];" (2) he or she was "45 years of age or older, *or* was a spouse, cohabitant, or person providing primary physical or economic support to the [anchor resident];" and (3) he or she "[h]as an ownership interest in, or is in expectation of an ownership interest in, the dwelling unit within the housing development that limits occupancy, residency, or use on the basis of age." *See* Cal.Civ.Code § 51.3(b)(2) (emphasis added).

27. Section 51.3(j) provides that, "The covenants, conditions, and restrictions or other documents or written policy of the senior citizen housing development *shall permit* the occupancy of a dwelling unit by a permitted health care resident during any period that the person is actually providing live-in, long-term, or hospice health care to a qualifying resident for compensation." (Emphasis add-

ed). • A "permitted health care resident" is "a person hired to provide live-in, long-term, or terminal care to a qualifying resident." *Id.* § 51.3(c)(6).

28. Section 51.3(e) provides that, "The covenants, conditions, and restrictions or other documents or written policy *shall permit* temporary residency, as a guest of a senior citizen or qualified permanent resident, by a person of less than 45 years of age for periods of time, not less than 60 days in any year, that are specified in the covenants, conditions, and restrictions or other documents or written policy." (Emphasis added).

29. For example, if only "business establishments" were prohibited from discriminating under the Unruh Act, an individual unaffiliat-

Court rejects the County's assertion that it need not respect the rights afforded to persons within the State of California by the Unruh Act.

To begin, the text of the Unruh Act undermines the County's position that the Unruh Act only bars discrimination "by business establishments." It is true that the Unruh Act's operative provision provides that, "All persons within [California] are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, or disability are entitled to the full and equal accommodations, advantages, facilities, privileges, or services *in all business establishments of every kind whatsoever*." Cal.Civ.Code § 51 (emphasis added). However, this provision only defines *who* is protected and *where* they shall be free from discrimination; it does not define—and limit—*what* persons are liable for such discrimination. Instead, section 52 defines who is liable for violations of the Unruh Act.

The text of section 52 makes clear that persons and entities who are not themselves "business establishments" are subject to the prohibitions imposed by section 51. For example, section 52(a) states that, "*Whoever* denies, aids or incites a denial, or makes any discrimination or distinction contrary to Section 51 ..., is liable for each and every offense for [damages and attorney's fees]." (Emphasis added). Likewise section 52(c) states that, "Whenever there is reasonable cause to believe that *any person or group of persons* is engaged in conduct of resistance to the full enjoyment of any of the rights hereby secured, ... any person aggrieved by the conduct may bring a civil action in the

appropriate court by filing with it a complaint." (Emphasis added).

The County's position is further undermined by two lower court decisions which indicate that public officials are liable, and can be enjoined, under the Unruh Act when actions taken in their official capacity deprive individuals of rights guaranteed by the Unruh Act. In *Nicole M. v. Martinez Unified School Dist.*, 964 F.Supp. 1369 (N.D.Cal.1997), plaintiff sued the principal of her school and the superintendent of the school district for actions that they took in their official capacities. She alleged that their failure to provide her protection from sexual harassment deprived her of rights guaranteed by the Unruh Act. Defendants filed a motion to dismiss for failure to state a claim upon which relief may be granted, but the court denied it, noting that the principal and superintendent could be liable under the Unruh Act since " '[w]hoever ... makes any discrimination or distinction contrary to Section 51 or 51.5' " is subject to suit under the Unruh Act. *Id.* at 1389 (quoting Cal.Civ.Code § 52(a)) (emphasis added).

Similarly, in *Gates v. Superior Court*, 32 Cal.App.4th 481, 38 Cal.Rptr.2d 489 (1995), the California Court of Appeal implied that injunctive relief is available under the Unruh Act when public officials acting in their official capacity disregard rights guaranteed to individuals by section 51 of the Unruh Act. Plaintiffs in *Gates* were three individuals who were injured in the 1992 Los Angeles riots. They sued the defendants, who were senior commanders in the Los Angeles Police Department, for their damages, alleging that defendants, pursuant to a pre-existing and on-going racially

ed with a business could stand outside of the business and prohibit racial or religious minorities (or others protected by section 51) from entering the business. As the Court's analysis will make clear, sections 51 and 52 of

the Unruh Act, when read together, clearly make such conduct actionable even though the individual or entity denying others access to a "business establishment" is not a "business establishment."

discriminatory practice, intentionally withdrew police protection from minority neighborhoods during the riots while increasing police deployment in predominantly "Anglo" neighborhoods. Plaintiffs relied on section 52 of the Unruh Act as one basis for recovering damages.

After a lengthy analysis, the *Gates* court found that California Government Code § 845 ("section 845") precluded an award of damages based on the Unruh Act. *Id.* at 513, 38 Cal.Rptr.2d 489. But in so finding, the court went out of its way to suggest that injunctive relief, had it been sought, would have been available to prevent violations of the Unruh Act by government officials acting in their official capacity:

> The first amended complaint alleges an ongoing deliberate racially based misallocation of police resources, but does not seek future equitable relief. Section 845 is only an immunity from the payment of monetary damages—it is inapplicable to suit for equitable relief.... This opinion, which discusses the section 845 immunity from the duty to pay damages, may not be read that equitable relief is unavailable when police supervisors discriminate in the deployment of protective resources for racial reasons. [*Id.* at 497, 38 Cal.Rptr.2d 489.]

If governmental entities and officials were not prohibited from discriminating by the Unruh Act because they are not "business establishments," the *Gates* court would not have needed to analyze whether

section 845 shielded the defendants from liability for money damages since the defendants would not have been liable in the first place. *See Caldwell v. Montoya,* 10 Cal.4th 972, 978 n. 3, 42 Cal.Rptr.2d 842, 897 P.2d 1320 (1995) (noting that as a general principle, "the application of governmental-immunity statutes should not be considered until it has been determined that the agency or official sued owes a 'duty' which would otherwise be actionable").

Finally, the County's position is undercut by two decisions of the California Supreme Court, in which the court held that a state agency's licensing/regulatory powers are limited by section 51 of the Unruh Act. In *Stoumen v. Reilly,* 37 Cal.2d 713, 234 P.2d 969 (1951), the court held that the Board of Equalization could not withhold the liquor license of a bar where homosexuals gathered on the grounds that the bar was a place where people resort for purposes which are injurious to public morals.[30] The court reasoned that, because the Unruh Act required the bar to serve homosexuals, the Board of Equalization could not punish the bar for doing so. *See id.* at 716, 234 P.2d 969.[31]

In *Orloff v. Los Angeles Turf Club,* 36 Cal.2d 734, 227 P.2d 449 (1951), the court held that a horse-racing track violated the Unruh Act when it excluded a man who, while at the track, talked to persons with criminal records and who was "reputed to be a bookmaker." The Unruh Act permit-

---

**30.** At the time, section 58 of the Alcoholic Beverage Control Act provided that, "Every [liquor] licensee ... who keeps or permits to be used or suffers to be used, in conjunction with a licensed premises, any disorderly house or place in which people abide or to which people resort ... for purposes which are injurious to the public morals ... shall be guilty of a misdemeanor." *See Stoumen,* 37 Cal.2d at 715 n. 1, 234 P.2d 969.

**31.** In a recent case summarizing the history of the court's interpretation of the Unruh Act, the California Supreme Court characterized *Stoumen,* without reservation or qualification, as follows: "In *Stoumen v. Reilly* ..., we held that the State Board of Equalization acted illegally in suspending the license of a bar and restaurant because it allowed patronage by homosexual persons." *Harris v. Capital Growth Investors XIV,* 52 Cal.3d 1142, 1151, 278 Cal.Rptr. 614, 617, 805 P.2d 873 (1991).

ted horse-racing tracks to exclude persons of immoral character, but the court found that a person could not, under the Unruh Act, be labeled as one of immoral character based solely upon unsubstantiated reputation evidence. *See id.* at 741, 227 P.2d 449.

The horse-racing track defended itself by pointing to a regulation passed by the California Horse Racing Board which required it to eject "known undesireables, touts, [and] persons under suspicion." But the court rejected that defense, noting that:

[I]nsofar as [the California Horse Racing Board] govern[s] the licensee in exercising the power of exclusion of persons from participation in the public entertainment afforded, [the board] may not be deemed to narrow the established right of participation by all persons [afforded by the Unruh Act].... [T]he board may not enlarge the instances when the proprietor of a public race-course may lawfully place restraints on the rights of members of the public to attend the races.... [The board may not exercise its powers] to extend discriminatory exclusion beyond that reasonably provided by the legislature.... *The board may make only such exceptions to the public's right to equal participation as are validly included in the Civil Code.* [*Id.* at 737, 227 P.2d 449 (emphasis added).] [32]

The County cites a recent California Court of Appeal decision in support of its position that the Unruh Act applies only *to* business establishments, as opposed to discrimination which takes place *in* business establishments. *See Burnett v. San Francisco Police Dept.,* 36 Cal.App.4th 1177, 1191–92, 42 Cal.Rptr.2d 879, 887 (1995). According to the *Burnett* court, "By its plain language, the [Unruh] Act bars discrimination based on 'sex, race, color, religion, ancestry, national origin, or disability' by *'business establishments.'* Nothing in the Act precludes *legislative bodies* from enacting ordinances which make age distinctions among adults." *Id.* (emphasis in original) (citing Cal.Civ.Code § 51).

**32.** This court recognizes that both *Stoumen* and *Orloff* were interpreting prior versions of sections 51 and 52. The previous version of section 51 differed somewhat from the current version; it stated, "All citizens within the jurisdiction of this state are entitled to the full and equal accommodations, advantages, facilities and privileges of inns, restaurants, hotels, eating-houses, places where ice cream or soft drinks of any kind are sold for consumption on the premises, barber shops, bath houses, theaters, skating rinks, public conveyances and all other places of public accommodation or amusement, subject only to the conditions and limitations established by law, and applicable alike to all citizens." However, in amending section 51 to proscribe discrimination "in all business establishments of every kind whatsoever," the California legislature sought to broaden the category of "places of accommodation" where discrimination would be prohibited, not to limit the provision's protections in any way. *See Marina Point,* 30 Cal.3d at 731–36, 180 Cal.Rptr. 496, 640 P.2d 115.

Moreover, section 52 is the provision that proscribes who is liable for violations of section 51, and the previous version of section 52 is largely similar to the current section 52; it provided, "Whoever denies to any citizen, except for reasons applicable alike to every race or color, the full accommodations, advantages, facilities, and privileges enumerated in section fifty-one of this code, or who aids, or incites, such denial, or whoever makes any discrimination, distinction or restriction on account of color or race ... in respect to the admission of any citizen to, or his treatment in [any of the listed places of public accommodation], or whoever aids or incites such discrimination, distinction or restriction, for each and every offense is liable in damages in an amount not less than one hundred dollars...." This court, thus, does not discern any textual basis for subjecting governmental entities to the limitations imposed by the previous versions of sections 51 and 52 while immunizing them from the limitations imposed by the current versions of section 51 and 52.

This Court might agree with the *Burnett* court's conclusions if the plain language of Section 51 was set forth as the *Burnett* court set it forth. However, even though the *Burnett* court purported to rely on the "plain language" of section 51, it significantly changed the meaning of section 51 when it replaced the words "in all business establishments" with the words "by 'business establishments.' " *See* Cal.Civ.Code § 51 ("All persons [in California] ... are entitled to the full and equal accommodations, advantages, facilities, privileges, or services *in* all business establishments of every kind whatsoever.") (emphasis added).

The *Burnett* court might be correct in its conclusion that laws which distinguish adults by age in a non-arbitrary way do not violate the Unruh Act. However, to the extent that the *Burnett* court held that the Unruh Act does not prohibit (1) cities and counties from intentionally depriving persons of rights guaranteed by the Unruh Act and (2) government officials from enforcing laws and policies which deprive individuals of rights guaranteed by the Unruh Act,[33] such holdings cannot be squared with the previously-discussed authorities. The Court therefore discounts the *Burnett* court's interpretation of the Unruh Act's scope, and will instead adhere to the California Supreme Court's admonition in *Orloff* that a governmental entity "may make only such exceptions to the public's right to equal participation as are validly included in the Civil Code." *Orloff,* 36 Cal.2d at 737, 227 P.2d 449.

It is thus clear that neither the County nor its agents may enforce laws which directly or indirectly abridge the rights afforded to individuals by section 51 of the Unruh Act. These rights include the right to be free from discrimination based on familial status or age in securing housing. *See O'Connor,* 33 Cal.3d at 792, 191 Cal. Rptr. 320, 662 P.2d 427 (holding that restriction in a condominium's covenants, conditions, and restrictions which prohibited persons younger than 18 violated the Unruh Act); *Marina Point,* 30 Cal.3d at 744, 180 Cal.Rptr. 496, 640 P.2d 115 (holding that apartment complex's prohibition against persons younger than 18 violated the Unruh Act); *Park Redlands Covenant Control Comm. v. Simon,* 181 Cal.App.3d 87, 95, 226 Cal.Rptr. 199 (1986) (holding that 45 or older age restriction in a condominium's covenants, conditions, and restrictions was "patently violative of the Unruh Act"); *see also Burks v. Poppy Const. Co.,* 57 Cal.2d 463, 469, 20 Cal.Rptr. 609, 611, 370 P.2d 313 (1962) (holding explicitly that the Unruh Act applies to purchases of real property).

Because Section 18.7 sets forth a policy that prohibits persons who are not at least 50 or 55 years of age from enjoying the full and equal advantages of buying or renting property in S.C.D.-zoned areas, as a matter of law, it violates the Unruh Act's prohibition against arbitrary age-based / familial-status-based discrimination unless it qualifies for the HSC exemption as senior housing. *See* Cal.Civ.Code §§ 51 & 51.2; *O'Connor,* 33 Cal.3d at 792, 191 Cal. Rptr. 320, 662 P.2d 427; *Marina Point,* 30 Cal.3d at 744, 180 Cal.Rptr. 496, 640 P.2d 115; *Park Redlands,* 181 Cal.App.3d at 95, 226 Cal.Rptr. 199. Therefore, the legality of the County's S.C.D. zoning under the Unruh Act depends upon whether the County's zoning satisfies the requirements of section 51.3 of the Unruh Act.

---

**33.** Plaintiffs in *Burnett* also sought to preclude enforcement of the allegedly discriminatory ordinance by the San Francisco Police Department and the department's police chief, both of whom were named as defendants. *See Burnett,* 36 Cal.App.4th at 1182, 42 Cal.Rptr.2d 879.

## b. The County Does Not Qualify for the Unruh Act's HSC Exemption (Section 51.3).

 The County does not qualify for the Unruh Act's HSC exemption as set forth in section 51.3. Not only is the current Section 18.7 more restrictive than permissible, but it also fails to affirmatively allow, as section 51.3 requires, residency by "permitted health care residents" and visitors who do not qualify as "qualified permanent residents."

Since May 19, 1993, Section 18.7 has required that "each dwelling unit in [areas whose zoning symbol includes the suffix S.C.D.], that is occupied, ... be occupied solely by persons 55 years of age or older in accordance with the 'housing for older persons' provisions of the Fair Housing Amendments Act of 1988 (42 U.S.C. § 3607), as they now exist and as they may from time to time be amended." However, the Unruh Act's HSC exemption expressly forbids those seeking to qualify for it from instituting a blanket 55 or older policy: "The ... written documents or written policy [of a residential development seeking to qualify for the HSC exemption] *shall not* limit occupancy, residency, or use on the basis of age more proscriptively than to require that one person in resi-dence in each dwelling unit may be required to be a senior citizen [i.e., 55 or older] and that each other resident in the same dwelling unit may be required to be a qualified permanent resident." Cal.Civ. Code § 51.3(d) (emphasis added). A blanket 55 or older policy does not allow for the residency of "qualified permanent residents" who, by definition, could be any age. *See id.* § 51.3(c)(2). For this reason alone, the current Section 18.7 fails to satisfy the requirements of the Unruh Act's HSC exemption.[34]

There is another reason that the current Section 18.7 fails to satisfy the requirements set forth by the Unruh Act's HSC exemption. Section 51.3 requires the written policies of developments seeking the HSC exemption to permit the temporary residency of (1) guests of any age who do not qualify as "qualified permanent residents," *see* Cal.Civ.Code § 51.3(e), and (2) "permanent health care residents." *See id.* § 51.3(j). Section 18.7 fails to do so, and contrary to the County's assertion that the zoning regulation should be read as implicitly incorporating such exceptions, sections 51.3(e) and 51.3(j) require that the exceptions be included explicitly in the development's written policy.[35] Accordingly,

**34.** The County cites *Huntington Landmark Adult Community Assoc. v. Ross,* 213 Cal. App.3d 1012, 1019, 261 Cal.Rptr. 875, 879 (1989), for the proposition that a 40–or–older policy is currently permissible under the Unruh Act. Such is not the law, and contrary to the County's assertion, *Huntington* does not support such a proposition. The *Huntington* court only found that a 40–or–over policy might have been permissible in certain circumstances *prior to 1985.* It recognized, however, that since January 1, 1985, the restrictions contained in section 51.3 govern whether a housing development is exempt from the Unruh Act's prohibition on age-based discrimination because it is senior housing.

The County also cites *Colony Cove Assoc. v. Brown,* 220 Cal.App.3d 195, 269 Cal.Rptr. 234 (1990), for the proposition that a blanket 55–or–older policy is permissible under the Unruh Act. However, *Colony Cove* dealt with a mobile home community which had been expressly exempted from the Unruh Act's prohibition on age-based discrimination. *See id.* at 199, 269 Cal.Rptr. at 237 (noting that section 51.2 and 51.3 "reflect a legislative intent to exclude mobile home parks from the reach of the [Unruh Act's prohibition on age-based discrimination]"). Thus, for a mobile home community, a blanket 55–or–older policy does not violate the Unruh Act. All other housing developments are governed by section 51.3 which prohibits a blanket 55–or–older policy.

**35.** The County argues that Section 18.7 implicitly incorporates section 51.3's requirements. According to the County, "These sorts

the failure to include such exceptions prohibits the County from claiming the Unruh Act's HSC exemption.

In sum, based on its conclusions that the Unruh Act applies to the County and its employees, that discrimination based on age and against individuals with children is prohibited by section 51 of the Unruh Act, and that the County has not satisfied the requirement imposed by section 51.3 on entities seeking to qualify as HSC, the Court as a matter of law will deny the County's motion for partial summary judgment as to Plaintiffs' Unruh Act claims and as a matter of law will grant Plaintiffs' motion for a summary adjudication ruling that the County's enforcement of Section 18.7's age-based zoning violates section 51 of the Unruh Act and has violated section 51 since January 1, 1985.[36]

### c. The County Does Not Qualify for the Unruh Act's HSC Exemption (Section 51.11).

■ In 1996, the California legislature added section 51.11 to the Unruh Act. Section 51.11 sets forth somewhat different requirements for qualifying for the Unruh Act's HSC exemption, requirements which are applicable only "to the County of Riverside." *See* Cal.Civ.Code § 51.11(j). However, section 51.11 does not change the provisions of section 51.3 which the Court concludes the County has not satisfied. Section 51.11 still requires that the written policy of a residential development seeking to qualify as senior housing "not limit occupancy, residency, or use on the basis of age more restrictively than to require that one person in residence in each dwelling unit may be required to be a senior citizen [i.e., 55 or older] and that each other resident in the same dwelling unit may be required to be a qualified permanent resident or permitted health care resident." Cal.Civ.Code § 51.11(c). As above, the County's blanket 55–or–older provision violates this prohibition in that it does not, on its face, allow for the residency of "qualified permanent residents."

Moreover, like section 51.3, section 51.11 explicitly requires that the written policy of a residential development seeking to qualify for the HSC exemption explicitly permit temporary residency by "permitted health care residents" and guests who do not qualify as "qualified permanent resi-

---

of obvious exceptions (e.g., a health care provider taking care of someone in a home) are assumed in any age restriction." (*See* Mem. of P. & A. in Opp'n to Pls.' Mot. for Partial Summ.J. and Summ.Adj. of Issues, at 29.) County's argument is flatly contradicted by the language of section 51.3. Section 51.3 does not require that a housing development seeking to qualify as HSC merely permit the residency of "permitted health care residents" and temporary residents who do not qualify as "qualified permanent residents;" it requires that the housing developments' *written policies* explicitly permit these residencies. *See* Cal.Civ.Code §§ 51.3(e) & 51.3(j). In effect, the requirement that the policy be in writing provides residents in housing developments which qualify as HSC with notice of their rights under the Unruh Act (and the FEHA, *see infra* ). Thus, a policy in fact of complying with this requirement does not suf-

fice; the policy must actually be stated in the housing development's written policy, or in this case, in the text of the County's zoning regulation.

**36.** On January 1, 1985, section 51.3, which defines—and limits—what entities could qualify for the HSC exception to section 51's prohibition against arbitrary discrimination based on age and familial status, went into effect. The Court expresses no opinion on the legality of Section 18.7 under the Unruh Act prior to that date, although the Court notes that 50–or–older restrictions were not per se violative of the Unruh Act prior to January 1, 1985. *See Huntington*, 213 Cal.App.3d at 1019, 261 Cal.Rptr. 875 (holding that 40–or–older restriction in condominium's pre–1985 CC & Rs did not violate the Unruh Act).

dents." *See id.* §§ 51.11(d) & 51.11(i). On its face, Section 18.7 permits neither of these things and thus, for this reason also, fails to satisfy the requirements of section 51.11.

### 5. The County's Enforcement of Section 18.7's Age Restrictions Violates the FEHA.

Plaintiffs contend that Section 18.7's age restrictions are also illegal under the FEHA. Since January 1, 1994, it has been unlawful under the FEHA "[t]o discriminate through public or private land use practices, decisions, and authorizations because of race, color, religion, sex, *familial status,* marital status, disability, national origin, or ancestry. Discrimination includes, but is not limited to, restrictive covenants, *zoning laws,* denials of use permits, and other actions authorized under the Planning and Zoning Law (Title 7 (commencing with Section 65000)), that make housing opportunities unavailable." Cal.Gov.Code § 12955(*1*) (emphasis added) ("section 12955(*1*)").[37] The County contends that because it qualifies as HSC, it is free to discriminate on the basis of familial discrimination without violating the FEHA. This is so because the California legislature exempted HSC (i.e., housing which satisfies the requirements of section 51.3 of the Unruh Act) from the FEHA provisions relating to discrimination on the basis of familial status. *See id.* § 12955.9 ("The provisions of this part relating to discrimination on the basis of familial status shall not apply to housing for older persons," which is defined to

include "[h]ousing that meets the standards for senior housing in Sections 51.2, 51.3, 51.4 of the Civil Code.").

As discussed above, at no time since January 1, 1994, has Section 18.7 been in compliance with the requirements set forth in section 51.3 of the Unruh Act. Therefore, since January 1, 1994, Section 18.7's age restrictions, which by definition preclude residency by families with children, also violate the FEHA's prohibition against zoning laws which discriminate on the basis of familial status. *See* Cal.Gov. Code § 12955(*1*). Accordingly, the Court as a matter of law will deny Defendants' motion for partial summary judgment as to Plaintiffs' FEHA claims and as a matter of law will grant Plaintiffs' summary adjudication motion ruling that the County's enforcement of Section 18.7's age-based zoning violates section 12955(*1*) of the FEHA and has violated section 12955(*1*) since January 1, 1994.

### 6. Plaintiffs Are Entitled to Injunctive Relief.

It is clear that the County is unable to qualify for the Unruh Act's HSC exemption under either section 51.3 or section 51.11. Because of this, enforcement of the age restrictions contained in Section 18.7 violates both the FEHA and the Unruh Act. The age restrictions are therefore void and unenforceable. Plaintiffs' request for injunctive relief will therefore be granted on each of these grounds. *See Koire v. Metro Car Wash,* 40 Cal.3d 24, 27, 28 n. 5, 219 Cal.Rptr. 133, 134 n. 5, 707 P.2d 195 (1985) ("Although the Unruh Act makes no

**37.** For purposes of the FEHA, " 'familial status' means one or more individuals under 18 years of age who reside with a parent, another person with care and legal custody of that individual, a person who has been given care and custody of that individual by a state or local governmental agency that is responsible for the welfare of children, or the designee of

that parent or other person with legal custody of any individual under 18 years of age by written consent of the parent or other person with legal custody of any individual under 18 years of age by written consent of the parent or designated custodian." Cal.Gov.Code § 12955.2.

express provision for injunctive relief, that remedy as well as damages may be available to an aggrieved person."); Cal.Gov. Code § 12989.2 (empowering courts to grant injunctive relief to prevent violations of the FEHA).

## D. Application of Section 65008

Though briefed quite extensively by the parties, the issue whether the California legislature's 1995 amendment to section 65008 applies retroactively is only relevant to whether certain individuals living in dwelling units within S.C.D.-zoned areas have acquired nonconforming use rights against ongoing enforcement of Section 18.7's age restrictions. Because of the court's conclusion that enforcement of Section 18.7's age restrictions *presently* violates both the FEHA and the Unruh Act, no party needs nonconforming use rights against enforcement of Section 18.7's age restrictions. Therefore, the Court need not, and will not, adjudicate the retroactivity issue.

The Court does note, however, that absent another amendment of the state's laws by the California legislature, section 65008 seems to make it impossible for the County to enact or enforce age-based zoning. Section 18.7, as currently written, violates both the Unruh Act and the FEHA and will continue to violate those acts barring amendment of Section 18.7. Yet, if the County were to amend Section 18.7, any age-based zoning restriction would violate section 65008 insofar as subsection (e)(1) thereof only excepts zoning laws enacted by the County of Riverside prior to January 1, 1995. *See Gibson*, 132 F.3d at 1313 (holding that section 65008(a) renders age-based zoning null and void); Cal.Gov.Code 65008(e)(1) (providing the County of Riverside an exception to section 65008(a)'s prohibition on age-based

zoning, but only to the extent such "zoning was enacted prior to January 1, 1995").

## E. Plaintiffs' Other Causes of Action

 Plaintiffs have moved for summary adjudication of other legal issues underlying some of their other causes of action, most of which are grounded upon alleged violations of certain provisions of the constitutions of the United States and the State of California. The County, in turn, has moved for partial summary judgment on all of these claims. In light of the Court's resolution of the other bases for the cross motions for partial summary judgment, the Court will deny as moot Plaintiffs' and Defendants' motions in regards to these causes of action since most of them involve constitutional issues, which are to be avoided where possible. The Court does note, however, that to the extent that the County seeks to amend Section 18.7 to comply with state and federal law—if this is even possible—California Supreme Court decisions interpreting the California constitutional right to privacy seriously call into question the ability of a county to impose age restrictions on any area larger than a "neighborhood." *See Schmidt v. Superior Court*, 48 Cal.3d 370, 388–90, 256 Cal.Rptr. 750, 769 P.2d 932 (1989) (strongly suggesting that a zoning ordinance would violate the California Constitution if it imposed, as opposed to permitted, age restrictions which precluded families with children from residing in areas greater than or equal in size to a "neighborhood"); *cf. City of Santa Barbara v. Adamson*, 27 Cal.3d 123, 133, 164 Cal.Rptr. 539, 544–45, 610 P.2d 436 (1980) ("In general, zoning ordinances are much less suspect when they focus on the use than when they command inquiry into who are the users."). The California legislature cannot on its own provide the County of Riverside with an exception to this constitutional provision.

## V.

## DISPOSITION

A. Based on the foregoing analysis it is ordered that Plaintiffs' motion for partial summary judgment is granted in part and denied in part and Defendants' motion for partial summary judgment is granted in part and denied in part in accordance with the following legal conclusions and declarations which are based on the uncontroverted evidence:

(1) From March 28, 1989 until November 6, 1995, the County failed to satisfy the "policy and procedures" requirement of 42 U.S.C. § 3607(b)(2)(C)(iii) and thus did not qualify as 55–or–older housing for older persons;

(2) In enacting and enforcing each version of Section 18.7, the County made dwelling units unavailable to Plaintiffs based on familial status in violation of 42 U.S.C. § 3604(a);

(3) In enacting and enforcing each version of Section 18.7, the County discriminated against Plaintiffs in the terms and conditions of sale and rental of dwellings based on familial status in violation of 42 U.S.C. § 3604(b);

(4) In enacting and enforcing each version of Section 18.7, the County, in violation of 42 U.S.C. § 3617, interfered with Plaintiffs in their enjoyment of their right to be free from discrimination based on familial status;

(5) In enacting each version of Section 18.7, the County published a statement with respect to the sale and rental of dwellings that indicated a preference based on familial status in violation of 42 U.S.C. § 3604(c);

(6) In causing to be served upon Plaintiffs Notices of Reported Violations and Notices of Violations containing Section 18.7's age-based restrictions, the County caused to be published statements with respect to the sale or rental of housing indicating a preference based on familial status in violation of 42 U.S.C. § 3604(c);

(7) In causing to be served upon Plaintiffs Notices of Reported Violations and Notices of Violations containing Section 18.7's age-based restrictions, the County, in violation of 42 U.S.C. § 3617, coerced, intimidated, threatened, and interfered with Plaintiffs in their enjoyment of their right to be free from discrimination based on familial status;

(8) By causing a Notice to Appear for a purported violation of Section 18.7 to be served upon Plaintiff Douglas Gibson, the County, in violation of 42 U.S.C. § 3617, coerced, intimidated, threatened, and interfered with the Gibsons in their enjoyment of their right to be free from discrimination based on familial status;

(9) Because each version of Section 18.7 has purported to require or permit actions that are discriminatory under the FHA, each version was invalid and of no effect during all relevant time periods pursuant to 42 U.S.C. § 3615;

(10) The County and the individually-named defendants acting in their official capacity are subject to the limitations imposed by the Unruh Act; [38]

(11) No version of Section 18.7 satisfies the requirements imposed by Cal.Civ.Code §§ 51.3 & 51.11;

(12) By enforcing the age restrictions contained in Section 18.7 which preclude

---

**38.** For purposes of legal conclusions (10), (14), and (15) only, the Court distinguishes between the County as a separate entity and the individually-named defendants. *Cf. supra* note 3. Thus, when the Court refers to "the County," it means only the County of Riverside as a public entity.

families with children from obtaining housing, the County violated section 51 of the Unruh Act;

(13) By enforcing the age restrictions contained in Section 18.7 which preclude families with children from obtaining housing, the County violated California Government Code § 12955(*1*);

(14) The County and the individually-named defendants are immune from any liability for damages, under the Unruh Act and the FEHA, insofar as such liability might derive from their involvement with enactment, and failure to repeal, each version of Section 18.7; and

(15) Plaintiffs are entitled to an injunction, based on the Unruh Act and the FEHA, prohibiting the County's enforcement of Section 18.7's age-based use restrictions.

B. The motions for partial summary judgment filed by Plaintiffs and the County are otherwise DENIED as moot.

C. Plaintiffs shall submit to the court and serve on defendants a proposed judgment for injunctive and declaratory relief consistent with the foregoing analysis and conclusions no later than 30 days from the date of this order. If the parties are unable to agree to the proposed judgment as submitted, defendants shall file and serve a written opposition to the proposed judgment no later than 45 days from the date of this order and plaintiffs shall submit a reply no later than 15 days after they are served with the opposition.